MERCHANTS ENVIRONMENTAL INDUSTRIES, INC., Plaintiff-Appellant, v. SLT REALTY LIMITED PARTNERSHIP *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—99—2942

Opinion filed June 6, 2000.

Beermann, Swerdlove, Woloshin, Barezky, Becker, Genin & London, of Chicago (Alvin R. Becker and Christopher A. White, of counsel), for appellant.

Thomas F. Sax, of Pedersen & Houpt, of Chicago, for appellee Iron Mike's L.L.C.

Rosenthal & Schanfield, P.C., of Chicago (James M. Dash and Stephen P. Kikoler, of counsel), for appellee SLT Realty Limited Partnership.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff Merchants Environmental Industries, Inc. (MEI), appeals from an order of the circuit court of Cook County granting summary judgment in favor of defendants SLT Realty Limited Partnership (SLT) and Iron Mike's, L.L.C. (Iron Mike's). In the order appealed from, the court granted summary judgment as to counts I and II of MEI's amended complaint for foreclosure of a mechanic's lien in the amount of $219,317.75. Pursuant thereto, the court entered the necessary Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) finding to make its ruling immediately appealable. MEI argues on appeal that summary judgment was improper because there were triable issues as to whether its notice of lien and recording of lien were timely, and whether a waiver of lien filed in August 1997 operated to waive MEI's lien rights. For the reasons set forth below, we affirm the granting of summary judgment as to SLT, but reverse it as to Iron Mike's, and remand for further consideration.

## BACKGROUND

On May 13, 1998, MEI filed its amended complaint for foreclosure of mechanic's lien and other relief against SLT, Iron Mike's, Tom Gold Construction Company (Gold), MS Tremont, L.P. (Tremont), and several other defendants. MEI alleges that in October 1996 Iron Mike's leased part of the premises at 100 East Chestnut in Chicago, Illinois (also known as the Tremont Hotel), to be used as a restaurant. At that time the owner of the premises was Tremont, but SLT subsequently became the owner (allegedly on April 8, 1997), and the Iron Mike's lease was transferred to SLT, which then became the successor landlord.[1] Prior to that purchase, while Tremont was still the owner, MEI alleges that End Zone Enterprises, Inc., the manager of Iron Mike's, contracted with Gold to act as general contractor in the construction of space in the hotel premises to house Iron Mike's restaurant. At about the same time (November 1996), MEI avers that it entered into a subcontract with Gold to perform heating, ventilation, and air conditioning (HVAC) work in the Iron Mike's project for the sum of $115,000.

MEI further alleges that, at the specific request of Gold and the premises owner, it furnished additional duct work, equipment and pip-

---

[1]Tremont subsequently moved to be dismissed as a defendant because it no longer had an ownership interest in the 100 East Chestnut premises and therefore was not a necessary party. The motion was granted on July 31, 1998.

ing for the project, and that the total amount due for those extras was $210,323.42. According to MEI, as of August 29, 1997, it had completed all work required under the subcontract plus all extra work requested. MEI avers that it has received payments of $106,005.67, leaving a balance due of $219,317.75, which MEI asserts has not been paid despite frequent requests. Therefore, MEI claims a mechanic's lien on the premises plus "the materials, fixtures, apparatus and machinery furnished by it[,] and upon the moneys or other considerations due or to become due from the Owner to [Gold] for said amounts due the Plaintiff."

MEI alleges that its notice of mechanic's lien claim of subcontractor, dated November 6, 1997, was sent within 90 days after its completion of all work and delivery of all materials and thus was timely. In addition, MEI avers that its subcontractor's claim for lien, recorded December 17, 1997, was timely filed within four months after completion of all work and delivery of all materials.

In count I of the amended complaint, which is designated "Action to Foreclose on Mechanics' Lien," MEI seeks execution of its mechanic's lien "for whatever sum shall be found due *** including statutory interest from August 29, 1997, and its costs herein." Alternatively, in count II, designated "Action Against Owner and Contractor Jointly Pursuant to 770 ILCS 60/28," MEI seeks judgment jointly and severally against SLT and Gold for $219,317.75 plus statutory interest and costs.[2]

Attachments to the amended complaint include a copy of the above-mentioned subcontract between Gold and MEI, dated November 22, 1996; a copy of MEI's notice of mechanics' lien claim of subcontractor, dated November 6, 1997; and a copy of MEI's subcontractor's notice and claim for lien, recorded December 17, 1997.

SLT filed a motion for summary judgment on March 16, 1999, alleging that a waiver of lien to date executed by MEI on August 29, 1997, waived any of MEI's mechanic's lien rights up to and including that date, in exchange for a payment of $31,938. SLT also alleged that MEI completed all of its work on the property before August 17, 1997, and that its claim for lien, which was recorded December 17, 1997, therefore came more than four months after the completion date and was untimely under section 7 of the Mechanics Lien Act (Act) (770 ILCS 60/7 (West 1992)).

Attached to the motion is a copy of MEI's August 29, 1997,

[2]Counts III and IV, designated "Action Against Contractor" and "Action for Quantum Meruit Against Contractor," were not ruled on by the trial court and are not the subject of this appeal.

"Waiver of Lien to Date," which states that, in consideration of a payment of $31,938, "the receipt whereof is hereby acknowledged," MEI

> "do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics' liens, with respect to and on said above-described premises [Iron Mike's, 100 East Chestnut Street], and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor services, material, fixtures, apparatus or machinery, furnished to this date [August 29, 1997] by the undersigned [MEI] for the above-described premises."

In addition, the "Contractor's Affidavit" attached to the waiver states that "all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers." The affidavit also lists the total contract price (for both plumbing[3] and HVAC work) as $450,120.95, the amount already paid as $198,835, an amount ($31,938) designated as "this payment," and the "balance due" as $219,347.95, which is the amount claimed in MEI's amended complaint.

In support of its allegation that MEI's lien claim was not timely filed, SLT attached an index of MEI time sheets for the Iron Mike's project that was included in a report by Joseph Manzi, described by SLT as MEI's "opinion witness." The last week listed in that index is the week ending May 13, 1997. SLT also attached what it terms "the very last time sheet of *any* sort produced by the Plaintiff" (emphasis in original), which is for the week ending July 29, 1997 (not August 29, 1997). One of the entries on that time sheet shows two hours of work on July 25, 1997, and SLT claims that entry is the only one bearing one of MEI's project numbers for the Iron Mike's project. However, that entry states the address as "200 Adams," which is not the address of the Iron Mike's property.

In further support of its untimeliness allegation, SLT attaches an MEI invoice to Gold dated June 3, 1997, stating that it is the "[f]inal billing" for the 100 East Chestnut project. The invoice also notes that "this bill does not reflect any change orders that may be in process." Under the HVAC portion of the June 3 invoice, the amount of "Work Completed To Date" is shown as $325,335, which is slightly more than the $325,323.42 total amount for subcontract work and extras asserted by MEI in its (subsequent) amended complaint. The invoice

---

[3]MEI also did plumbing work on the project, but it is only its HVAC work that is the subject of the amended complaint.

also shows ".00" after "Balance to Complete." Also attached to the summary judgment motion is a letter from MEI to Gold dated July 1, 1997, which refers to the June 3, 1997, bill as "our final invoice for the work completed on the Iron Mike's Restaurant project." The letter states that, "[d]ue to the amount of our final payment request, we cannot wait beyond our 30 (thirty) day invoice terms," adding that MEI has "no choice but to protect our lien rights."

On March 29, 1999, Iron Mike's filed its motion for summary judgment, raising the same waiver defenses that SLT did. Iron Mike's also alleged that MEI's notice of mechanic's lien, dated November 6, 1997, was filed more than 90 days after the completion date and was thus untimely under section 24 of the Mechanics Lien Act (770 ILCS 60/24 (West 1992)). In support of its allegation that the lien notice was untimely, Iron Mike's attached copies of MEI's June 3, 1997, invoice and July 1, 1997, letter, both of which were submitted with SLT's motion.

In further support of its untimeliness allegation, Iron Mike's submitted graphs from the previously mentioned Manzi report, one of which shows labor for the HVAC subcontract, including changes, ending no later than May 4, 1997. Another of the graphs shows the HVAC work ended during the week of August 3, 1997. Iron Mike's notes that even if the work were completed on that date, it would still be too early for the November 6, 1997, lien notice to have been timely. Also included in the submissions are two MEI time sheets, one allegedly showing that the Iron Mike's work was finished on May 8, 1997. The other is the same July 29, 1997, time sheet that was included in SLT's motion.

Finally, Iron Mike's submitted what it termed Gold's "last contractor's sworn statement" indicating a balance due to MEI of $31,938, which is the same amount stated in MEI's August 29, 1997, "Waiver of Lien to Date." Iron Mike's also submitted a copy of its check dated October 17, 1997, payable to MEI for that amount: $31,938.

In its responses to the summary judgment motions, MEI asserted that its last day of work on the project was August 29, 1997, when it installed eight ceiling air diffusers in the first-floor kitchen of the restaurant. MEI therefore averred that both its November 6, 1997, notice of lien claim and its December 17, 1997, recorded lien were timely filed. MEI also alleged that its August 29, 1997, waiver of lien to date does not bar its lien claim because neither SLT nor Iron Mike's relied upon that waiver as a final waiver of lien.

In support of its responses, MEI submitted an affidavit of Al Kupsik, MEI's project manager on the Iron Mike's project. In that affida-

vit, Kupsik stated that it was MEI's standard practice to send out a "final" bill before work was completed on a project. "Due to its years in business, MEI is able to determine what it will take to complete the work on a project, and so it prepares a 'final' bill although MEI is still on the project. That is what happened on the Iron Mike's project." According to Kupsik, "[i]n June, 1997, when the June 3, 1997[,] 'final' bill was sent to Tom Gold, MEI still had to install eight (8) ceiling grills in the first floor kitchen." Kupsik said MEI had expected to be able to install those grills around the time of the June 3 "final" bill but that Iron Mike's kept rescheduling the work. He said the grills were finally installed on August 29, 1997, adding that those installations "were part of MEI's base contract work."

Kupsik also stated in the affidavit that when MEI's first waiver of lien to date (dated November 6, 1996) was submitted to Gold, all parties were alerted that the waiver was subject to any pending change orders. He said payment to MEI of $20,160 pursuant to that first waiver of lien to date "was authorized on the basis of the November 6, 1996[,] lien waiver which clearly indicates it does not accurately reflect MEI's full up-to-date subcontract price." Kupsik said the same thing about MEI's second waiver of lien to date for $178,675, dated December 31, 1996.

Kupsik averred that prior to the August 29, 1997, waiver of lien, which was actually submitted on October 20, 1997 (and apparently backdated to August 29), there had been correspondence with Gold and meetings between MEI, Gold and Iron Mike's "regarding MEI's claim for additional work under the HVAC contract." He said that during a meeting on September 29, 1997, "MEI advised, and Iron Mike's acknowledged, that other money was due and owing to MEI." Kupsik added that "[a]fter the August 29, 1997[,] waiver of lien was submitted to Tom Gold, Iron Mike's acknowledged that MEI's invoices were still in dispute."

In support of that last statement, the Kupsik affidavit included a copy of an undated document on Iron Mike's Grille letterhead addressed to MEI, stating that: "Pursuant to the discussion between Joe Priola [of Iron Mike's] and Al Kupsik, it is understood that all invoices are in dispute. The enclosed $31,938 [the amount stated in the August 29, 1997, waiver of lien to date] does not release MEI from any part of the ongoing dispute." In a handwritten addition, it was noted that neither "Tom Gold Construction [n]or End Zone Enterprises" was released from the dispute as well. The document was signed by both Priola and Kupsik. Also attached to the affidavit was a work ticket dated August 29, 1997, indicating that two men worked eight hours each at Iron Mike's on that date installing "supply air diffusers in kitchen on 1st floor."

Other submissions accompanying MEI's responses included copies of the previously mentioned November 6, 1996, and December 31, 1996, waivers of lien to date, along with copies of a check from Iron Mike's dated December 12, 1996, for $20,160 (the amount stated in the first waiver) made payable to MEI, and a check from Ticor Title Insurance Company (drawn on Iron Mike's account) dated January 13, 1997, for $178,675 (the amount of the second waiver) made payable to MEI.

On June 29, 1999, the trial court granted SLT's and Iron Mike's motions for summary judgment as to counts I and II of the amended complaint. The court found that although the eight ceiling grills were not installed until August 29, 1997, MEI had "substantially completed its contract work at IRON MIKE'S GRILL [sic]" as of June 3, 1997.[4] The court found further that "[a]lthough the installation of the eight ceiling grills in the kitchen was part of plaintiff's base contract work, it involved minor matters better characterized as 'trivial work.' " Thus the trial court found that MEI's notice of lien, dated November 6, 1997, and its lien claim, recorded December 17, 1997, were untimely, and MEI's mechanic's lien therefore was not enforceable against SLT or Iron Mike's. The instant appeal followed.

## DISCUSSION

On appeal, MEI argues that there are genuine issues of material fact as to when MEI completed its work on the project and thus contends that there are triable issues as to whether its notice of lien and lien claim were timely. Hence, MEI argues that summary judgment was improper. MEI also argues that its August 29, 1997, lien waiver does not offer an alternative basis for affirming summary judgment because there are triable issues as to whether SLT and Iron Mike's reasonably relied upon that lien waiver in making payment.

### A. The Timeliness Issue

MEI asserts that the last date it performed work on the Iron Mike's project was August 29, 1997, when it installed eight ceiling grills in the restaurant's first-floor kitchen. MEI also argues that, contrary to the trial court's ruling and the defendants' contentions, that work was not trivial and therefore established August 29 as the completion date. The defendants question whether any work was done on August 29, 1997, and if so, whether it was included in the work for which MEI claims a mechanic's lien. They also argue that if work was done on August 29, it was trivial and therefore did not serve to extend the completion date.

---

[4]In the memorandum opinion and order, the date is stated as "June 3, 1999," but that is undoubtedly a misprint.

■ Under section 24 of the Mechanics Lien Act (Act), a subcontractor must file a notice of lien claim within 90 days after "completion" of his work in order for the claim to be enforceable. This notice requirement is substantial and not merely a limitation on the remedy. See *Lundy v. Boyle Industries, Inc.*, 46 Ill. App. 3d 809, 812, 361 N.E.2d 321, 323 (1977) (notice to owner "has been determined to be the very substance upon which a mechanics' lien may be predicated"). Section 24 provides in pertinent part:

> "Sub-contractors, or party furnishing labor or materials, may at any time after making his or her contract with the contractor, and shall within 90 days after the completion thereof, or, if extra or additional work or material is delivered thereafter, within 90 days after the date of completion of such extra or additional work or final delivery of such extra or additional material, cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent by registered or certified mail, with return receipt requested, and delivery limited to addressee only, to or personally served on the owner of record or his agent or architect, or the superintendent having charge of the building or improvement and to the lending agency, if known ***." 770 ILCS 60/24 (West 1992).

Thus the notice must be sent within 90 days after completion of the furnishing of labor or materials. MEI's notice of mechanic's lien claim, dated November 6, 1997, was sent to Tremont, SLT, Gold, Iron Mike's, and Iron Mike's in care of End Zone Enterprises.

Another requirement in the Act applies to actions against third-party purchasers such as SLT. In order for the mechanic's lien to be enforceable against such a party, either a suit must be filed or the lien claim itself must be recorded within four months after "completion" of the work. This requirement "is a condition of liability itself and not just a limitation on the remedy." *Waldbillig Woodworking, Inc. v. King Arthur's North, Ltd.*, 104 Ill. App. 3d 417, 420, 432 N.E.2d 1048, 1051 (1982). Section 7 of the Act provides:

> "No contractor shall be allowed to enforce such lien against or to the prejudice of any other creditor or incumbrancer or purchaser, unless within 4 months after completion, or if extra or additional work is done or material is delivered therefor within 4 months after the completion of such extra or additional work or the final delivery of such extra or additional material, he or she shall either bring an action to enforce his or her lien therefor or shall file in the office of the recorder of the county in which the building, erection or other improvement to be charged with the lien is situated, a claim for lien, verified by the affidavit of himself or herself, or his or her agent or employee, which shall consist of a brief statement of the contract, the balance due after allowing all credits, and a

sufficiently correct description of the lot, lots or tracts of land to identify the same." 770 ILCS 60/7 (West 1992).

Hence, in order for MEI's lien claim to be enforceable against a third party such as SLT, it must have been filed within four months after completion of the work. MEI's lien claim was recorded on December 17, 1997.

If the completion date were August 29, 1997, as MEI claims, then both its notice and lien claim would be timely under the Act. In that regard, the defendants first question whether any work was done on that date, pointing to MEI's billing records and the previously mentioned Manzi report dealing with MEI's contract performance on the Iron Mike's project. MEI's June 3, 1997, invoice to Gold states that it is a "[f]inal billing to provide the necessary labor, material, equipment, tools and supervision to install all of the associated duct-work, gas piping and all H.V.A.C. work as well as perform the plumbing work." The June 3 invoice lists under the HVAC portion a total of $325,335 as work completed to date, which is essentially the same as the $325,323.42 HVAC total claimed in MEI's amended complaint, indicating (according to Iron Mike's) that "no substantive additional work was done" after June 3, 1997. Further, the July 1, 1997, letter from MEI to Gold describes the June 3 invoice as "our final invoice for the work completed on the Iron Mike's Restaurant project," apparently implying that the work was completed as of that date. In addition, the Manzi report includes no records for work performed on August 29, 1997.

■ The foregoing notwithstanding, we believe that MEI has at least raised a genuine issue of material fact as to whether the ceiling grill work was performed on August 29, 1997. Included in MEI's submissions in response to the summary judgment motions is a work ticket dated August 29, 1997, indicating that two workers spent eight hours each on that date completing installation of "air diffusers in kitchen on 1st floor" at Iron Mike's. The air diffusers are also described as "grilles & registers" on the work ticket. In addition, Kupsik's affidavit states that it is MEI's "standard practice" to send a "final" bill before work is completed on a project. He asserts that such a practice was followed on the Iron Mike's project, adding that in June 1997, when the June 3, 1997, "final" bill was sent to Gold, "MEI still had to install eight (8) ceiling grills in the first floor kitchen." He said MEI had expected to be able to install those grills around the time of the June 3 bill but that Iron Mike's kept rescheduling the work. According to Kupsik, the grills were finally installed on August 29, 1997, as "part of MEI's base contract work." Kupsik's affidavit and the August 29 work ticket support a reasonable inference that the ceiling

grill work was included in the June 3, 1997, invoice but was not completed until August 29, 1997. The trial court also found that the ceiling grills were installed on that date. Therefore, we find that, at minimum, a genuine issue of material fact exists as to whether the work in question was performed on August 29, 1997.

■ Even if the work were performed on that date, SLT argues that it was not included in the work for which MEI claims a lien and thus MEI's lien claim was untimely recorded under section 7 of the Act as to it. " ' "[C]ompletion " as used in section 7 does not refer to completion of the contract. It means completion of the work for which a contractor seeks to enforce his lien. [Citation.]' [Citation.]" *D.M. Foley Co. v. North West Federal Savings & Loan Ass'n*, 122 Ill. App. 3d 411, 414, 461 N.E.2d 500, 502 (1984). According to MEI's June 3, 1997, invoice, the contract price of the work it had performed on the project to that date was $452,783 (work completed to date on the HVAC portion ($325,335) plus work completed to date on the plumbing portion ($127,448)). That total is more than $2,000 higher than the $450,120.95 subcontract price stated in the contractor's affidavit accompanying the August 29, 1997, lien waiver. SLT thus contends that because the total contract price stated in the August 29 affidavit is less than the total price stated in the June 3 invoice, "there can be no question that all of the work for which MEI is claiming its lien was performed no later than June 3, 1997," and the August 29 installation of ceiling grills was not included in that work. Therefore, SLT argues that August 29, 1997, is not the completion date and MEI's lien claim was untimely recorded. We disagree. As already noted, we think it reasonable to infer that the ceiling-grill installations were included in the June 3, 1997, invoice. We thus find SLT's argument here unconvincing.

MEI also argues that the trial court erred when it found that the work done on August 29, 1997, was trivial and thus did not extend the completion date to August 29. MEI contends that there is evidence the work was not trivial and thus there is a triable issue as to whether August 29 was the completion date. We find that argument persuasive.

Under Illinois law, "[w]ork that is trivial and insubstantial, and not 'essential to the completion of the contract,' does not extend the time to file a lien under the Mechanics Lien Act." *Braun-Skiba, Ltd. v. La Salle National Bank*, 279 Ill. App. 3d 912, 919, 665 N.E.2d 485, 491 (1996), quoting *Miller Brothers Industrial Sheet Metal Corp. v. La Salle National Bank*, 119 Ill. App. 2d 23, 29-30 (1970). Various factors are cited by the courts in determining whether work is trivial. Singular among them is whether the work is needed to complete the contract. See *Capital Plumbing & Heating Supply Co. v. Snyder*, 2 Ill.

App. 3d 660, 665-66, 275 N.E.2d 663, 667 (1971) (finding that installation of ornamental railing and the painting of other railings not trivial where it was done "to complete the work so that the bill could be submitted to the general contractor"); see also *De Anguera v. Arreguin*, 92 Ill. App. 2d 381, 385, 234 N.E.2d 808, 810 (1968) ("question is whether the work done by the plaintiff was trivial and inconsequential in character or was essential to the completion of the contract"); *cf. Miller Bros. Industrial Sheet Metal Corp. v. La Salle National Bank*, 119 Ill. App. 2d 23, 30, 255 N.E.2d 755, 759 (1969) (work that is in the nature of maintenance or correction of a completed job rather than work needed for "the completion of the contract itself" will not extend the time in which to file a lien claim).

Another factor in determining whether work is trivial is whether it was done at the request of the owner. See *Alexander Hendry Co. v. Mooar*, 242 Ill. App. 516, 519-20 (1926) (adjusting of door and fixing of lock held to be trivial and inconsequential where work was not requested by owner "as extra or additional work on the original contract" but instead was "new and separate repair work"). Part of the rationale underlying this request-of-owner factor appears to be that a contractor not be allowed to do work on his own initiative purely in order to revive a lien claim that was lost because of failure to comply with timeliness requirements. See *Alexander Hendry*, 242 Ill. App. at 520 (unrequested adjustments performed several months after work was substantially completed are viewed as "unwarranted attempt to revive a lien"); *Schaller-Hoerr Co. v. Gentile*, 153 Ill. App. 458, 461-62 (1910) (installation of wire window guard without owner's permission or knowledge is seen as attempt "to enforce a lien" and is held ineffectual to revive the lien). Other factors include whether the work was "substantial" (*Du Page Bank & Trust Co. v. Du Page Bank & Trust Co.*, 122 Ill. App. 3d 1015, 1021, 462 N.E.2d 25, 29 (1984)), and whether it was needed to make the project suitable for its intended purpose (*Du Page Bank*, 122 Ill. App. 3d at 1021, 462 N.E.2d at 29). As already indicated, work that is in the nature of maintenance or correction of a completed job, or that is repair work, will not extend the time to file a mechanic's lien.

In the instant case, the work involved was not a repair or a correction, nor can it be described as maintenance of completed work. Kupsik states in his affidavit that the installation of eight ceiling grills by MEI at Iron Mike's on August 29, 1997, was "part of MEI's base contract work." Kupsik also states that the installations had been rescheduled repeatedly by Iron Mike's, which is why they were not completed until six months after the restaurant opened in February 1997. That supports a reasonable inference that the August 29, 1997,

work was done at the request or demand of Iron Mike's. In rescheduling the work, Iron Mike's was in effect stating that they did not want it done at a previously scheduled time but they *did want it done* at the new time.

Defendants argue that the August 29, 1997, ceiling grill installations should be seen as trivial because they were not necessary to make the building operable or suitable for its intended use. We disagree. As already indicated, while suitability for intended use may be one factor in determining whether work is trivial, it is not the only one. It exists side by side with other factors, including whether the work was requested by the owner and whether it was essential to completion of the contract. That last factor is at least as important as operability or suitability, and likely more so.

In support of their suitability argument, defendants attempt to rely upon *Du Page Bank*, but their reliance is misplaced. In *Du Page Bank*, the contractor entered into a contract with a property owner in May 1979 to build a restaurant. The contractor's work appeared to be completed on June 25, 1980, but on October 30, 1980, he had a plumber move vent stacks at the request of the owner. The original location of the stacks had resulted in a serious ventilation problem in the restaurant. According to the contractor, he was obligated under the contract "to remedy the defect as a part of his requirement to perform in a good and workmanlike manner." *Du Page Bank*, 122 Ill. App. 3d at 1021, 462 N.E.2d at 29. On January 7, 1981, the contractor filed a mechanic's lien claim, stating that the last day of work on the contract was October 30, 1980, which meant the lien was filed within four months of the completion date and was timely. A question on appeal was whether the work on October 30 was trivial and thus failed to extend the completion date, making the lien untimely. The appellate court found that the work did extend the time for filing the lien, noting that even though the restaurant had already opened for business, there was a problem with gas odors that made the building unsuitable for its intended use until the ventilation problem was corrected. Hence, suitability for intended purpose was a factor in the court's decision. In the instant case, defendants argue that the installation of ceiling grills clearly was not necessary to make the building suitable for its intended use. They note that Iron Mike's had been open and operating for more than six months when the grills were installed and that the restaurant could have operated indefinitely without the work being performed. Nevertheless, even if that were so, we do not believe it makes any difference here.

*Du Page Bank* does not stand for the proposition that defendants assert. Though suitability for intended use was a factor in the court's

decision, it was not the only one. The court in *Du Page Bank* also noted that the moving of the vent stacks was substantial, was done at the request of the owner, and was required to complete the contract. As previously noted, in the instant case it is reasonable to infer that MEI's ceiling grill installations were done at the request of Iron Mike's and were required to complete the contract. Further, the work at issue in *Du Page Bank*, unlike the ceiling grill installations in the instant case, was corrective or remedial in nature and thus under ordinary circumstances would not have been substantial enough to extend the completion date. See *Miller Bros.*, 119 Ill. App. 2d at 30, 255 N.E.2d at 759 (time in which to file mechanic's lien not extended by "maintenance or correction of completed work" as opposed to work that completes the contract itself). The *Du Page Bank* court applied the suitability analysis in this context, apparently to show that though the work was corrective, it was called for by the contract. Here, by contrast, the August 29, 1997, ceiling grill installations were part of MEI's base contract work, and a suitability analysis arguably is not needed.

Defendants also rely upon *De Anguera v. Arreguin*, 92 Ill. App. 2d 381, 234 N.E.2d 808 (1968), for the proposition that work needed to make something operable is not trivial or inconsequential. Their reliance here is misplaced as well. In *De Anguera*, the trial court held that the plaintiff's servicing of windows that previously had been supplied to the owner effectively extended the time for perfecting a mechanic's lien. The servicing, which took about 1½ hours, "consisted of removing leveling blocks, installing clamps and lock handles, rubbing paraffin on the weather strip and making other minor adjustments." *De Anguera*, 92 Ill. App. 2d at 383, 234 N.E.2d at 809. The trial court found that, without that servicing, the windows would have been inoperable, and the appellate court affirmed. In reaching its decision, the appellate court referred to the trial court's finding that, without the servicing, the windows would not have been operable. Nevertheless, the court in *De Anguera*, similar to *Du Page Bank*, focused upon the more encompassing context of "whether the work done by the plaintiff was trivial and inconsequential in character or was essential to the completion of the contract for the furnishing and installation of the windows." *De Anguera*, 92 Ill. App. 2d at 385, 234 N.E.2d at 810. As already noted, according to Kupsik the ceiling grill installations in the instant case were part of MEI's base contract work and were thus inferentially essential to the completion of its contract. Hence, an operability analysis was not necessary.

Moreover, any argument suggesting that only operability or suitability determines whether work is trivial is undercut by *Capital*

*Plumbing,* to which we have previously referred. In *Capital Plumbing,* the plaintiff had subcontracted to provide "certain ornamental metal work and air-conditioner stands" for an apartment building that was being constructed. 2 Ill. App. 3d at 662. The work was allegedly completed on January 3, 1966, when the plaintiff installed "a five foot ornamental railing" and did some painting on other railings that had been previously installed. 2 Ill. App. 3d at 665. He served notice of a mechanic's lien on March 4, 1966. On appeal, the appellees argued that the notice of lien was not timely served, contending that the work performed on January 3, 1966, was trivial and thus did not extend the period for service of notice. The appellate court held that the notice was timely, implicitly finding that the installation of an "ornamental" railing was not trivial. Because the railing in *Capital Plumbing* was ornamental, it clearly was not needed to make anything in the project operable. Still, it was found not to be trivial.

For the foregoing reasons, we find that MEI has at minimum raised a genuine issue of material fact as to whether its installation of eight ceiling grills on August 29, 1997, was substantial enough to warrant extension of the completion date to August 29. If August 29, 1997, were the completion date for the contract, then MEI's notice of lien and lien claim would be timely. Hence, there is a triable issue as to whether those lien filings were timely, and summary judgment on that basis was improper.

## B. The Lien Waiver Issue

MEI also argues that its August 29, 1997, lien waiver does not offer an alternative basis for affirming the trial court's granting of summary judgment. MEI contends that there are triable issues as to whether SLT and Iron Mike's reasonably relied upon that lien waiver as a final release of MEI's lien claims. If there was no such reliance, MEI argues, then the lien waiver did not function as a final release. Defendants argue initially that because the August 29, 1997, lien waiver is clear and unambiguous, extrinsic evidence as to reliance cannot be considered. We disagree.

■ "Generally, where the terms of a waiver of lien are clear and unambiguous, extrinsic evidence which varies from or contradicts such terms cannot be considered in order to determine the intent of the parties ***." *Premier Electrical Construction Co. v. La Salle National Bank,* 132 Ill. App. 3d 485, 492, 477 N.E.2d 1249, 1255 (1984). However, that parol evidence rule applies "only when the party against whose property a lien is sought has relied upon the waiver of lien in innocence and good faith." *Premier,* 132 Ill. App. 3d at 492, 477 N.E.2d at 1255; see also *Fisher v. Harris Bank & Trust*

*Co.*, 154 Ill. App. 3d 79, 87, 506 N.E.2d 418, 423 (1987) ("[W]hile a clear unambiguous waiver of mechanic's lien rights bars an action under the Mechanics' Liens Act, this rule is only applicable where an innocent party has relied upon that waiver in making payments to the general contractor"). Further, "[w]hether there has been such innocent, good-faith reliance is a question of fact." *Premier*, 132 Ill. App. 3d at 492, 477 N.E.2d at 1255. In the instant case, MEI's August 29, 1997, waiver of lien is plainly unambiguous. It states that MEI waives and releases any and all mechanic's lien rights against the subject premises as to payment for labor services, material, fixtures, apparatus or machinery furnished by MEI up to August 29, 1997. While MEI does not argue that the lien waiver here was ambiguous, nevertheless, at least for purposes of summary judgment, we believe that extrinsic evidence as to reliance can be considered here.

The question of whether there has been innocent reliance in this instance depends upon whether there was a good-faith belief that the August 29, 1997, lien waiver represented a full release of MEI's lien rights for all work up to that date. MEI contends there was no such belief and that the parties never interpreted MEI's waivers of lien (to date) in that manner; instead, the waivers were viewed as applying only to the work being paid for at the time they were submitted. Hence, the question becomes whether custom or usage would be helpful in determining how the waivers of lien to date were viewed by the parties. If so, it should be considered, and we think that it should. "Proof of custom or usage is intended as an aid to the interpretation of the intent of the parties at the time the contract was made." *Chicago Bridge & Iron Co. v. Reliance Insurance Co.*, 46 Ill. 2d 522, 531, 264 N.E.2d 134, 139 (1970). "If a usage exists in a particular trade of which both parties either had notice or should have had notice, it is only just and proper that their contract should be interpreted in view of the trade practice." *Chicago Bridge*, 46 Ill. 2d at 531-32, 264 N.E.2d at 139, citing *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 299 F. 991 (S.D.N.Y. 1924) (Learned Hand, J.). Further, according to the Restatement (Second) of Contracts, "[t]here is no requirement that an agreement be ambiguous before evidence of a usage of trade [or course of dealing] can be shown, nor is it required that the usage of trade [or course of dealing] be consistent with the meaning the agreement would have apart from the usage [or course of dealing]." Restatement (Second) of Contracts § 222 Comment *b*, § 223 Comment *b* (1981). See also 5 W. Jaeger, Williston on Contracts § 648, at 6-7 (3d ed. 1961) ("Usage is an ordinary means of proving the local or technical meaning of language, and *even language which is normally clear and unambiguous* may be shown by usage to bear, under the circum-

stances of the case, a meaning different from its normal sense" (emphasis added)).

Defendants argue that extrinsic evidence should not be considered, relying upon *Country Service & Supply Co. v. Harris Trust & Savings Bank,* 103 Ill. App. 3d 161, 430 N.E.2d 631 (1981), and *Miller Bros. Industrial Sheet Metal Corp. v. La Salle National Bank,* 119 Ill. App. 2d 23, 255 N.E.2d 755 (1969). Their reliance is misplaced. In *Country Service,* the plaintiff had executed a series of lien waivers in exchange for periodic payments to it on a subcontract for excavation work. All but one of the waivers were designated waivers of lien to date, and the exception was designated a partial waiver of lien. Similar to the instant case, each waiver was accompanied by a "payout order" stating, *inter alia,* the amount of the current payment and the balance. When the payments stopped coming, the plaintiff sued to foreclose a mechanic's lien against the defendant's property. The defendant moved for summary judgment, arguing that the plaintiff, by its lien waivers, had released all claims for a mechanic's lien for work performed prior to April 18, 1975, the date of the last waiver. The defendant submitted an affidavit from the lending agency stating that the lien waivers were understood by it and were "intended to waive all lien rights to their dates and that payments would not have been made otherwise." *Country Service,* 103 Ill. App. 3d at 163, 430 N.E.2d at 633. Also submitted was an affidavit from the contractor asserting that the waivers were intended to waive the plaintiff's lien rights up to the dates on the waivers. The plaintiff submitted its own affidavit stating that the lien waivers were intended to release its lien rights only as to the payments received at the time of the waivers, and to preserve the balance set forth in the accompanying payout orders. The trial court granted summary judgment, and the appellate court affirmed, finding that the plaintiff's lien waivers were not ambiguous and that there was no basis for considering the parties' conflicting affidavits. The appellate court also noted that the plaintiff had acknowledged that the lending agency "believed that the 'balance' noted in the statement of account [accompanying the lien waivers] was the balance to complete the contract and not *** the balance then due to [the plaintiff]." *Country Service,* 103 Ill. App. 3d at 166, 430 N.E.2d at 635.

Defendants note that the lien waivers in *Country Service* used essentially the same language as those in the instant case. They argue that, just as in *Country Service,* the lien waivers here are unambiguous and no extrinsic evidence should be considered to determine the intent of the parties. However, *Country Service* is distinguishable from the case at bar. In *Country Service,* the defendant submitted affidavits asserting in essence that there *was* innocent and good-faith reliance

on the waivers as complete releases of lien rights. In addition, the plaintiff in effect conceded that there was such reliance on the part of the lender. Here, defendants have submitted no affidavit asserting that there was good-faith reliance, and MEI has not acknowledged that there was such reliance.

Defendants' reliance upon *Miller Bros.* also is unavailing. In *Miller Bros.*, the plaintiff filed a complaint to foreclose a mechanic's lien. Among the evidence before the trial court was a partial waiver of lien executed by the plaintiff stating that in consideration of a payment of $56,851.23, the plaintiff waived and released its lien rights up to January 18, 1967, the date of the waiver. Affidavits were submitted by the plaintiff and by Thomas Cooper, the president of a company that had been a defendant but was subsequently dismissed, stating that "both parties understood that there was a substantial balance owed Miller Bros. on January 18 and that the waiver was partial only and was not intended, despite its language, as a complete waiver for all work done to that date." *Miller Bros.*, 119 Ill. App. 2d at 31, 255 N.E.2d at 759-60. The trial court refused to reform the waiver even though both affiants were present in open court and could have testified as to their intentions at the time the waiver was executed. The appellate court affirmed, noting that "a written instrument is presumed to show the intention of the parties and will not be reformed unless the evidence of mutual mistake or other grounds for reformation is strong and convincing." *Miller Bros.*, 119 Ill. App. 2d at 32, 255 N.E.2d at 760. The court found the evidence that was presented insufficient to warrant reformation, noting that Cooper's affidavit was contradicted by his prior statement that the plaintiff had been overpaid. The appellate court also emphasized that "[t]he waiver itself expressly stated in the body that any and all liens or claims of liens were waived for work done to the date it was signed." *Miller Bros.*, 119 Ill. App. 2d at 32, 255 N.E.2d at 760.

As they did with *Country Service*, defendants argue that here, just as in *Miller Bros.*, the waivers of lien were unambiguous and should not be supplemented with extrinsic evidence. However, *Miller Bros.* also is distinguishable from the instant case. First, *Miller Bros.* does not even address the question of good-faith, innocent reliance, which is the central issue here. That is probably because, having been decided in 1969, it came before the reliance issue was emphasized in Illinois lien waiver decisions. Compare, *e.g.*, *Premier*, 132 Ill. App. 3d 485, 477 N.E.2d 1249 (decided in 1984), and *Fisher*, 154 Ill. App. 3d 79, 506 N.E.2d 418 (decided in 1987). In addition, *Miller Bros.* deals with contract reformation, an action that is based on "either mutual mistake or mistake on one side and fraud on the other." *Elson v. State*

*Farm Fire & Casualty Co.*, 295 Ill. App. 3d 1, 15, 691 N.E.2d 807, 817 (1998). Neither of those bases is the central issue here. Moreover, the decision being reviewed in *Miller Bros.* was made at trial where the standard of review is different than with a summary judgment motion. In *Miller Bros.*, the appellate court weighed the evidence and found it insufficient to warrant reversal. In the instant case, where the issue is summary judgment, MEI does not need to prove that defendants did not reasonably rely on its waiver; all it needs to do is raise a genuine issue of material fact as to whether there was such reliance.

For the foregoing reasons, we find that, in the instant case, extrinsic evidence may be considered as to whether there was such reliance. We turn then to evidence of usage or course of dealing between the parties suggesting that waivers of lien to date were not treated as final releases of lien rights. According to Kupsik's affidavit, which must be construed strictly against the defendants and liberally in favor of MEI (*Lackey & Lackey, P.C. v. Prior*, 228 Ill. App. 3d 397, 399, 591 N.E.2d 998, 1000 (1992)), when MEI submitted two prior waivers of lien to date (one on November 6 and the second on December 31, 1996), all parties were put on notice that neither of those waivers accurately reflected MEI's full, up-to-date contract price. The wording of those waivers is the same as the August 29, 1997, one. In addition, just as with the August 1997 waiver, the two 1996 waivers were accompanied by a contractor's affidavit that listed the amount stated in the waiver as "this payment" and a "balance due" beyond that payment. If (as the affidavit states) the 1996 waivers were not seen as full and final releases of lien rights, it is reasonable to infer that the August 29, 1997, waiver was not viewed as such either. That is particularly the case when we consider that the contractor's affidavit attached to the August 29, 1997, lien waiver listed a balance due of $219,347.95 beyond the $31,938 described in the affidavit as "this payment." We question whether it is reasonable to infer that the defendants believed in good faith that MEI was willing to forego its mechanic's lien rights as to a balance of more than $200,000 in return for a payment of $31,938.

In addition, there is evidence which further suggests that the August 29, 1997, waiver was not seen as a full release. According to Kupsik's affidavit, Iron Mike's acknowledged that MEI's invoices were still in dispute even after the August 29, 1997, lien waiver was submitted (on October 20, 1997) to Gold. As noted above, attached to that affidavit is a document on Iron Mike's Grille letterhead addressed to MEI stating that "it is understood that all invoices are in dispute." Though the document is undated, the second sentence refers to the

"enclosed $31,938," which is the amount stated in the August 29, 1997, lien waiver and the amount of Iron Mike's October 17, 1997, check to MEI. That evidence supports a reasonable inference that Iron Mike's did not consider the August 29, 1997, lien waiver to be a full release of lien rights as to all amounts due for MEI's work on the project up to that date. See *Delaney Electric Co. v. Schiessle*, 235 Ill. App. 3d 258, 263, 601 N.E.2d 978, 982 (1992) (in reviewing grant of summary judgment, all reasonable inferences from the record must be drawn in favor of nonmoving party). The parties agree that MEI's work on the project was completed by August 29, 1997. Indeed, both SLT and Iron Mike's argue that the work was substantially completed long before that date. Thus if after the August 29 waiver was submitted, Iron Mike's stated that "all invoices are in dispute," it could only be referring to invoices prior to that date.

Lastly, and more overridingly, the Kupsik affidavit also states that prior to the August 29, 1997, lien waiver, there had been correspondence with Gold and meetings between MEI, Gold and Iron Mike's regarding MEI's claim for additional work under the HVAC contract. Kupsik also asserts that during a (September 29, 1997) meeting to discuss the additional work done by MEI on the HVAC contract, "MEI advised, and Iron Mike's acknowledged, that other money was due and owing to MEI." Again, we think that evidence, taken with the previously mentioned evidence, supports an inference that the defendants did not in good faith rely upon the August 29 waiver as a full release of MEI's mechanic's lien rights as to all work performed on the project up to August 29, 1997.

The case of *Premier*, which was previously discussed, is directly in point. In *Premier*, the plaintiff, an electrical subcontractor, sought foreclosure of a mechanic's lien for electrical work it alleged had not been paid for. The trial court granted the defendants' motion to dismiss on the ground that the plaintiff had executed a final waiver of lien, finding in favor of the defendants despite the plaintiff's allegation that, based upon customary practice between the parties, the defendants knew the lien waiver "was not intended to accurately reflect the full current subcontract price including all extras" (*Premier*, 132 Ill. App. 3d at 489, 477 N.E.2d at 1253). The appellate court reversed, finding that the parties' respective affidavits established triable issues as to whether, *inter alia*, there was good-faith, innocent reliance upon the lien waiver. The plaintiff's affidavit "gave a detailed accounting of specific instances where payment to [the plaintiff] was authorized on the basis of lien waivers and pay-out notes which all parties knew did not accurately reflect the full, up-to-date subcontract price." *Premier*, 132 Ill. App. 3d at 493, 477 N.E.2d at 1255. The

defendants' affidavit, on the other hand, asserted that they "innocently relied upon [the plaintiff's] lien waiver and pay-out note in authorizing *** payment." *Premier*, 132 Ill. App. 3d at 493, 477 N.E.2d at 1255.

■ Here, just as in *Premier*, the Kupsik affidavit listed previous instances where, based on customary practice between the parties, MEI's waivers of lien to date were not viewed as accurately reflecting MEI's full, up-to-date subcontract price. However, unlike *Premier*, here there is no affidavit from defendants stating that they did in good faith rely upon MEI's waiver. If anything, MEI's argument as to good-faith reliance is stronger here than was the plaintiff's argument in *Premier*, where the court still found there were triable issues as to reliance.

Therefore, since the issue of whether there has been such innocent, good-faith reliance is a question of fact (*Premier*, 132 Ill. App. 3d at 492, 477 N.E.2d at 1255) and since we find that MEI has at least raised a triable issue as to whether its lien waiver was relied upon as a full release, we find that MEI's execution of its August 29, 1997, waiver of lien to date is not a sufficient basis for affirming the trial court's granting of summary judgment here.

## C. Completion Date

■ SLT argues separately that MEI's lien claim is unenforceable against it because MEI's section 7 lien claim did not contain a completion date.[5] Absent such a completion date, third-party purchasers such as SLT are unable to determine from the lien claim itself whether it is enforceable. SLT thus argues that inclusion of the completion date is required. We agree. Under section 7 of the Act, which is applicable here only to SLT as a third-party purchaser and not to Iron Mike's,[6] a mechanic's lien is not enforceable unless, within four months after completion of the work, either a lien claim is recorded or an action is brought to enforce the lien. The purpose for requiring the lien claim

---

[5]This contention is made only by SLT and not by Iron Mike's ostensibly because the argument has viability only to third parties such as SLT (as explained below) because section 7, pursuant to which this defense is interposed, applies only to third parties.

[6]As noted above, SLT purchased the Tremont Hotel property after MEI entered into its subcontract with Gold to perform HVAC work in the Iron Mike's project. SLT thus is a third-party purchaser within the meaning of section 7, which by its terms applies only to third parties. The text of that provision, which is set out more fully earlier, begins: "No contractor shall be allowed to enforce such lien against or to the prejudice of any other creditor or incumbrancer or *purchaser* ***." (Emphasis added.) 770 ILCS 60/7 (West 1992).

to be filed within a specified time is that "third persons dealing with the property may have notice of the existence, nature and character of the lien as well as the times when the material was furnished and labor performed, and thus be enabled to learn *from the claim itself* whether it was such as can be enforced." (Emphasis added.) *Schmidt v. Anderson*, 253 Ill. 29, 32, 97 N.E. 291, 292 (1911); see also *Mutual Services, Inc. v. Ballantrae Development Co.*, 159 Ill. App. 3d 549, 553, 510 N.E.2d 1219, 1222 (1987); *Federal Savings & Loan Insurance Corp. v. American National Bank & Trust Co.*, 115 Ill. App. 3d 426, 429, 450 N.E.2d 820, 822 (1983); *Schwulst Gerling Co. v. Frost*, 269 Ill. App. 213, 220 (1933). While section 7 itself does not expressly require inclusion of the completion date in the lien claim, nevertheless that requirement must be inferred. One of the primary purposes of that section's four-month requirement is that third parties be enabled to learn *from the claim* whether it is enforceable. Without a completion date, a person examining the lien claim would not know whether the four-month filing requirement had been met. See *Schmidt*, 253 Ill. at 32-33, 97 N.E. at 292.

The decision in *Schmidt*, upon which SLT principally relies, is most instructive. In *Schmidt*, the work at issue was done on four separate houses, and the lien claim was filed more than four months after completion of work on three of them but within four months of completion of the fourth house. Our supreme court reversed the trial court and found that the lien could not be enforced. In reaching that decision, the court noted that the lien claim "[did] not designate which portion of the work or material was furnished for any special house, nor the time when such work was performed or the material furnished for each house." *Schmidt*, 253 Ill. at 31, 97 N.E. at 292. Instead, the claim stated only the beginning and ending dates for the entire project. The supreme court noted that if the lien claim had included the specific completion date for each house, then if any one of the houses had been completed within four months of the claim filing, the lien could have been enforced as to that house. However, without such specific completion dates, it was impossible to determine which of the houses was completed within four months of the filing date.

MEI attempts to distinguish *Schmidt* from the instant case on the ground that *Schmidt* involved multiple properties with multiple completion dates, and here the lien claim was filed against a single property, Iron Mike's restaurant. We find that argument unpersuasive. First, while *Schmidt* did deal with multiple properties, it required a completion date for each of them. Second, distinguishing on the basis of single property-multiple properties amounts to a distinction without a difference. If, as stated in *Schmidt*, a purpose of section 7's four-

month requirement is that a third party be enabled to learn from the claim itself whether it is enforceable, we do not understand what difference it makes whether the case involves one property or several. In either case, if the completion date is omitted, it is impossible for a third party to determine from the claim whether the four-month filing requirement was met, a requirement which we note "is a condition of liability itself and not just a limitation on the remedy." *Waldbillig Woodworking, Inc. v. King Arthur's North, Ltd.*, 104 Ill. App. 3d 417, 420, 432 N.E.2d 1048, 1051 (1982). We therefore see no reason why the requirement of a completion date in a lien claim should not apply to work on a single property, as well as to work on multiple properties. Accordingly, we find that the inclusion of a completion date was required here, and the omission of that date renders MEI's lien claim unenforceable against SLT.

Therefore, for the reasons set forth above, we affirm the trial court's granting of summary judgment as to SLT, but reverse it as to Iron Mike's, and remand for further consideration in conformity with this opinion.

Affirmed in part and reversed in part; cause remanded.

COUSINS, P.J., and McBRIDE, J., concur.