2014 IL App (1st) 123784

Nos. 1-12-3784, 1-13-0018 (cons.)

Fifth Division
September 26, 2014

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| NORTH SHORE COMMUNITY BANK AND TRUST COMPANY, | ) ) ) | |
| Plaintiff and Counterdefendant-Appellee, | ) ) ) | |
| v. | ) ) | |
| SHEFFIELD WELLINGTON LLC, | ) ) | Appeal from the Circuit Court of Cook County. |
| Defendant and Counterdefendant | ) ) | No. 09 CH 16804 |
| (Bluewater Capital Development, Inc., and Premier Roofing, Inc., | ) ) | The Honorable |
| Defendants and Counterplaintiffs-Appellants; | ) ) | Lisa R. Curcio, Judge Presiding. |
| | ) | |
| SMH Development, LLC, Sheffield Avenue Investors, LLC, and Employees Retirement Plan of Consolidated Electrical Distributors, Inc., | ) ) ) | |
| Counterdefendants). | ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Taylor concurred in the judgment and opinion.

**OPINION**

¶ 1    The issue in this appeal concerns whether, under the Mechanics Lien Act (the Act) (770

ILCS 60/1 *et seq.* (West 2008)), a contractor can file a mechanics lien with an incorrect

completion date and then amend the filing with a different completion date when the

contractor forecloses on the lien. Bluewater Capital Development, Inc. (Bluewater), and

Premier Roofing, Inc. (Premier), appeal the trial court's granting the motion of North Shore

Community Bank and Trust Company (the Bank), Sheffield Avenue Investors, LLC (SAI),

and Employees Retirement Plan of Consolidated Electrical Distributors, Inc. (ERPCED), for

summary judgment.[1] Bluewater also appeals the denial of its motion for summary judgment.

¶ 2        Plaintiffs contend (1) that the Bank released its mortgage on the subject property and

does not have standing; (2) that the trial court erred when it found that the facially valid dates

of completion stated on plaintiffs' lien claims constituted binding judicial admissions; (3)

that plaintiffs timely filed their lien claims and appropriately complied with all requirements

of the Act; and (4) that the trial court erred when it granted summary judgment against the

plaintiffs and when it denied plaintiffs' motions for leave to amend their complaints alleging

new completion dates within the statutory period. Bluewater additionally claims that there

are no issues of material fact precluding summary judgment in its favor.

¶ 3        For the reasons that follow, we reverse the grant of summary judgment in defendants'

favor and affirm the denial of Bluewater's motion for summary judgment.

¶ 4                                    BACKGROUND

¶ 5                              I. The Property and the Parties

¶ 6        Bluewater and Premier (collectively, plaintiffs) each performed construction work on the

subject property (property), a commercial building located at 2954-58 Sheffield Avenue in

Chicago, Illinois. At the time plaintiffs performed their work, Sheffield Wellington, LLC

(Sheffield), was the owner of the property and SMH Development, LLC (SMH) was its

general contractor. Since Seth M. Harris (Harris) was the sole member-manager of both

---

[1] The cases are separate appeals by two different mechanic's lien claimants in the same lower court case that were consolidated on this appeal.

Sheffield and SMH, they are referred to collectively herein as "the owner" unless otherwise noted.[2]

¶ 7    On May 29, 2008, the owner executed and delivered a "construction mortgage" on the property to the Bank for a loan in the principal amount of $2.65 million. As "additional security" for the loan, the owner assigned the Bank an interest in "rents and leases *** and income" from the property. Among other terms of the "Construction Mortgage, Security Agreement, Assignment of Leases and Rents and Fixtures Filing" (the mortgage), the owner agreed to "keep the [property] free from mechanics *** liens." The owner also agreed to "complete within a reasonable time any Improvements now or at any time in the process of erection upon the [property]."

¶ 8    Under the mortgage, the owner could be deemed in default if the owner failed to "pay any installment of principal or interest *** on the date when due, or *** within five (5) days." In other events where the owner "failed to perform any other obligation" under the mortgage, the owner would "have a period of thirty (30) days *** to cure" the failure before an "Event of Default [could] be deemed to exist." If an "Event of Default occur[ed]," the Bank retained the option to declare all unpaid principal and interest "immediately due."

¶ 9    On May 15, 2009, the Bank filed an action to foreclose its mortgage on the property. The Bank alleged (1) that, on April 2, 2009, the owner "defaulted under the terms of the mortgage"; (2) that the owner "failed to pay the amount due and owing under the Promissory Note" accompanying the mortgage; and (3) that of the original loan amount of $2.65 million, the principal amount due was $2,609,978.89, the interest accrued was $26,451.05, and the total amount due to the Bank was $2,637,535. The Bank further alleged that the owner

_____

[2] Notwithstanding this shorthand description, neither Harris nor any entity of Harris owned the property *at the time of this appeal.* The current owner of record is SAI.

entered into leases with two separate commercial tenants, that the owner was obligated to complete certain improvements on the property under those leases, and that the owner had abandoned those improvements before completion. The Bank alleged that "one tenant ha[d] notified the [owner] of the [owner's] default under the lease," and that "the other tenant [was] threatening to find alternate space if the improvements *** [were] not completed."

¶ 10　　As provided for in the terms of the mortgage, the Bank requested that a court-appointed receiver take immediate possession of the property. On June 4, 2009, the court granted the Bank's request to appoint Richard Wanland, Jr., as receiver, giving him "full power and authority with respect to the control, management, and improvement of the property" as well as "full power to market the property." However, "[a]ny sale of the property [had to] be approved by the court."

¶ 11　　On March 17, 2010, Wanland reported to the court that "[the Bank] ha[d] reached an agreement to sell the property" to SAI. Accordingly, Wanland presented the sale to the court for approval. The court approved it, finding that "the sale does not affect the validity, perfection, priority, or amount of any claim for mechanics lien against the property, all of which remain for future adjudication." The court then dismissed the owner[3] from the Bank's complaint to foreclose the mortgage.

¶ 12　　On March 26, 2010, Jeff M. Galus, a commercial banking officer for the Bank, signed and executed a release of the mortgage. A notary public certified that "Galus *** of North Shore Community Bank and Trust Company *** acknowledged [before the notary] that he signed and delivered the [release] *** for the uses and purposes set forth in the [release]." However, according to the verified affidavit of the Bank's senior vice president, Christopher

---

[3] Sheffield was the only entity of the owner dismissed in the trial court's order.

Swieca, "the release has not been delivered pursuant to the agreement of the parties and remains in escrow pending the resolution of this case." The Bank's mortgage, thus, "remains of record."

¶ 13     On April 15, 2010, SAI acquired the property by special warranty deed.[4] SAI then granted a mortgage to ERPCED. The Bank, SAI, and ERPCED are collectively referred to herein as "defendants."

¶ 14                         II. Bluewater Capital Development, Inc.

¶ 15                         A. Claim for Mechanics Lien

¶ 16     Bluewater, entered into an agreement with the owner to furnish labor and materials to construct an office at the property. According to the discovery deposition of Bluewater's president, Roi Kiferbaum, this agreement was created through various "proposals" and "change orders" made by the parties on December 3, 2008; December 9, 2008; December 16, 2008; and December 28, 2008. Kiferbaum testified that the owner "often [accepted the proposals and change orders] through a telephone call or onsite meeting." According to Kiferbaum's testimony, Bluewater "did [not] have a written contract with any SMH entity" of the owner. As noted, the contract was created by various proposals and change orders.

¶ 17     Bluewater began work on the property but did not complete its work, claiming it was not paid under the terms of their agreement with the owner. According to its "Subcontractor's Notice of Claim and Claim for Mechanics Lien," Bluewater alleges that (1) it entered into a "written contract" with the owner on December 16, 2008; (2) the total contract price was $218,050; (3) it "substantially" completed its work on Sunday, January 4, 2009; (4) the value

---

[4] On October 14, 2010, the court transferred the case to the mechanics lien section of the chancery division because the "[d]eed *** resolved [the Bank's] foreclosure claim, [but] mechanics lien issues remain."

of the work it performed and the materials it provided totaled $131,755; and (5) the owner had paid Bluewater only $30,000, leaving a $101,755 balance.

¶ 18    On April 3, 2009, Bluewater filed its mechanics lien claim and served the owner and the Bank with notice of the lien. In its action to foreclose its mortgage on the property dated May 15, 2009, the Bank named Bluewater as a defendant. On August 21, 2009, Bluewater counterclaimed to foreclose its mechanics lien against the Bank, Sheffield, and SMH. In this counterclaim, Bluewater alleges January 4, 2009, as the date of completion. On December 15, 2009, Bluewater obtained a default judgment against Sheffield and SMH, jointly and severally, for $101,755 after they failed to file an answer to Bluewater's counterclaim.

¶ 19    On December 5, 2011, Bluewater filed a motion for summary judgment against all remaining parties in its action. Bluewater attached Kiferbaum's affidavit to the motion, which claimed Bluewater completed its work on the property on January 4, 2009.

¶ 20                            B. Discovery

¶ 21    In its original document production, Bluewater provided a self-prepared timeline of the project and a series of emails between Kiferbaum and the owner from which the timeline was based. In an email dated December 16, 2008, the owner responded to Kiferbaum's specific questions regarding how the owner wanted certain improvements on the property to be made. In another email, dated December 17, 2008, Kiferbaum sent the owner "a list of [approved] items [that they] discussed at [their] site meeting on 12/16/08." In another email, dated Tuesday, December 30, 2008, the owner "accept[ed Bluewater's] $4600 proposal to pour the concrete floor at the new office floor" and promised to "give [Bluewater] a signed proposal on Monday [January 5, 2009] when [Bluewater] pour[ed] it."

¶ 22  Bluewater stated in its timeline of the project that Kiferbaum "made several attempts to resolve payment issues without success." In an email dated February 10, 2009, the owner requested that Kiferbaum "send [the owner] all of the open invoices" for the work completed by Bluewater. In another email dated, February 20, 2009, Kiferbaum told the owner that he "would be more [than] willing to discuss a solution that would be beneficial to both of us and least disruptive to either one's business."  In an email dated March 9, 2009, Kiferbaum asked the owner about its status in "resolving the payment issue" because it had "been over a week since [they] last spoke and [Kiferbaum had] not heard anything."

¶ 23  Additionally, Kiferbaum appeared for a discovery deposition on January 23, 2012. Keiferbaum testified that Bluewater worked on the property from December 2008 through early January 2009.

¶ 24  Keiferbaum was questioned about the date that Bluewater concluded work:

"COUNSEL: So the 27th of December would be the last day of actual physical work?

KIFERBAUM: No. Well now that I'm thinking about it, because there was the concrete workwhich was then paid by [Kiferbaum's father] ***.

* * *

COUNSEL: Okay. So based on these checks, unless you owe money to somebody for work after December 27 which you've said you don't, then the last date of work by Bluewater would have been or on behalf of Bluewater would have been December 27, 2008; is that right?

KIFERBAUM: Yes.

* * *

COUNSEL:  Now in Paragraph 13 [of Kiferbaum's affidavit] it says between the period of December 16 and January 4, 2009 Bluewater furnished the labor and materials [to the property.] *** In fact, as we've gone through, that actually happened starting somewhere around December 5th give or take and ending on December 27th; correct?

KIFERBAUM: Yes. Correct.

COUNSEL: [Paragraphs] 14 and 15 are just flat out wrong as far as the date goes; correct?

KIFERBAUM: As far as January 4th?

COUNSEL: Yes.

KIFERBAUM:  I mean that was an approximation when we just decided we're not continuing. This project's not, we're not continuing to perform work.

COUNSEL: So the last date on the project was on December 27th, 2008?

KIFERBAUM: Not necessarily.

COUNSEL: Hang on. Hang on. But you made the mental decision on January 4th that you were no longer going to go farther, do I have that right?

KIFERBAUM: Yes."

8

¶ 25    Kiferbaum was further questioned about the cement work his father, Hanan Kiferbaum, completed. He testified that his father paid for the concrete work and that "the idea was that Bluewater was going to reimburse him on that particular item." However, Kiferbaum testified that his father was never reimbursed and that he could not recall which date his father performed the concrete work. When Kiferbaum was asked whether Bluewater had ever employed anyone other than himself, Kiferbaum responded, "At one point, and I don't know if it's considered to be as an employee or subcontractor, my father, Hanan Kiferbaum, had worked on projects with me."

¶ 26    Finally, Kiferbaum was also questioned as to how he valued the work done on the property at $131,755 in light of Bluewater's document production:

"COUNSEL: When did you do this [calculate the amount for the lien]?

KIFERBAUM: Approximately the time when the lien was filed.

COUNSEL: Okay. So that was at least a good three months or so after you were off the job; correct?

KIFERBAUM: Correct.

COUNSEL: So what did you do? Did you sit in your office and say, hum, I think I remember that being 100% complete; I think I remember that being 85% complete?

KIFERBAUM: Yes.

COUNSEL: So you didn't go [to the property] and actually take measurements; correct?

KIFERBAUM: I had no access to the site.

9

COUNSEL: So you could be off by ten percent in some cases?

KIFERBAUM: Sure, I could be.

COUNSEL: Could be off by 20%

KIFERBAUM: I could not say for – I mean I – This is based on my best recollection of what was completed based on material purchased, *** based on what my judgment as contractor, as the subcontractor was.

\* \* \*

COUNSEL: So basically, it is your opinion; correct?

KIFERBAUM: Yes.

\* \* \*

COUNSEL: You don't have any documents that show how much labor was actually put into the project by Bluewater; correct?

KIFERBAUM: No.

\* \* \*

COUNSEL: The only documents that you have show approximately $25,629.93 of materials including the temporary heat [*sic*] that were put into the project; is that right?

KIFERBAUM: Yes.

COUNSEL: According to your judgment, Bluewater should be paid a grand total of $131,755 for its work on the project; correct?

KIFERBAUM: Yes."

10

¶ 27          C. Defendants' Response and Cross-Motion for Summary Judgment

¶ 28          Defendants responded to Bluewater's motion for summary judgment and filed a cross-motion for summary judgment on April 3, 2012. Defendants' response argued that (1) at best, Bluewater produced documentation accounting for only $64,351 in expenditures on the property and, therefore, had not produced sufficient evidence to supports its claim for $101,755; and (2) at the very least, material issues of fact existed as to the date of completion given the varying dates provided by Bluewater over the course of the litigation.

¶ 29          To its cross-motion for summary judgment against Bluewater, defendants relevantly attached Bluewater's lien claim and the entirety of its document production. The cross-motion argued that because the Act must be strictly construed against Bluewater, (1) Bluewater failed to comply with section 24 of the Act because it failed to serve notice of claim to the Bank within 90 days of its only completion date supported by evidence (December 27, 2008); (2) Bluewater could not prove it worked on Sunday, January 4, 2009; and (3) Bluewater failed to perfect its claim under section 7 of the Act because it described the contract in its lien claim as "written," but never produced a signed written contract to corroborate this description. Therefore, defendants argued, the lien was unenforceable against the Bank, SAI, and ERPCED.

¶ 30          On May 18, 2012, Bluewater responded to defendants' cross-motion for summary judgment and denied that its claim was not perfected. Bluewater claimed that while the January 4, 2009, date was mistaken, the actual completion date was not December 27, 2008, but January 5, 2009, and thus, within 90 days of its notice of claim to the Bank.

¶ 31          To this reply, Bluewater attached the full deposition of Kiferbaum and the affidavit of Keith Thomas, senior project manager for SMH, who averred that on December 30, 2008,

SMH accepted a change order proposal from Bluewater to pour concrete and "authorized the work to be performed on Monday, January 5, 2009," and that the concrete work was ultimately completed.

¶ 32                                III. Premier Roofing, Inc.

¶ 33                                A. Claim for Mechanics Lien

¶ 34        According to the "General Contractor's Claim for Mechanics Lien" filed by Premier Roofing, Inc., Premier entered into a contract on October 30, 2008, with SMH to remove the old roof on the property and install a new roof. According to the claim, Premier completed all work on the contract on February 27, 2009. The claim further alleges that Premier is due the full contract price of $44,454 for its work on the property.

¶ 35        Premier filed its mechanics lien claim on June 26, 2009. The lien claim stated that "the claimant [is] Premier Roofing and Jo[seph] Birt," and that "claimant made a contract *** dated October 30, 2008 with SMH Development, LLC under which claimant agreed to provide all necessary labor, material, and work."

¶ 36        On November 15, 2010, Premier counterclaimed against defendants to foreclose its mechanics lien. The counterclaim alleged that "on or about January 8, 2009," Premier entered into a contract with "Seth Harris and d/b/a SMH Development LLC, and d/b/a Sheffield Wellington LLC." The counterclaim alleged that Premier was due the full contract price and completed its last substantial work on the property on February 27, 2009. On December 13, 2010, the circuit court permitted Premier to intervene in the Bank's foreclosure proceedings.

¶ 37                                    B. Discovery

¶ 38          On January 23, 2012, Premier produced documents and served sworn answers in response to the Bank's document requests and interrogatories. Question 14 of the interrogatories requested Premier to "[s]tate the first and last date upon which [Premier] furnished labor and/or materials to the project and identify all documents evidencing these dates." Premier responded that "the date the project began was November 13, 2008, and the last date of the project [was] December 29, 2008, and see exhibit A and J of the production request." Exhibits A and J of the production request contained timesheets related to the project, the latest of which was dated December 29, 2008.

¶ 39          On April 9, 2012, Premier served amended responses to the Bank's document requests and written interrogatories. At this time, Premier produced two additional timesheets related to its work on the property, one dated February 9, 2009, and the other dated March 4, 2009.

¶ 40          Premier's president, Joseph Birt, appeared for a discovery deposition on April 18, 2012. Joseph testified that Premier keeps time records of its projects "in a [bound] book that goes to and from a job on a daily basis." He testified that the person in charge of Premier's project on the worksite was to "make a list of the people on the site, the time they start, and the time they finish." Joseph testified that the end of each week, Ann Birt (his wife and vice president of Premier) "total[s] up the hours, figure[s] out the rate of pay, [and] write[s the workers] a [handwritten] check." Joseph further testified that pages remain bound in the book, and that the book is stored on a shelf when all the pages are filled. He testified that he has "many years of [such] books."

¶ 41          Additionally, Joseph was asked about the completion date stated in Premier's counterclaim. He testified that he "believe[d]" that the February 27, 2009, completion date

came from "documents," although he stated that he did not know who picked that date for the complaint.

¶ 42    Moreover, Joseph was asked why the December 27, 2008, completion date originally sworn to in response to the Bank's written interrogatories was amended to March 4, 2009. Joseph testified:

> "JOSEPH: How did we come up with another date?
>
> COUNSEL: Yes.
>
> JOSEPH: We didn't look too deeply into it when we were looking for this paperwork.
>
> COUNSEL: You didn't look too deeply into it?
>
> JOSEPH: No, we didn't look deep enough into it.
>
> COUNSEL: Well, I thought you told me —
>
> JOSEPH: My wife, who was asked to look for this stuff, didn't know specifically. This is the first time this has ever happened to us as I told you before. I never had this happen before. She looked for stuff that she thought she was supposed to present. She did it to the best of her ability. When we found out we needed more, we looked a little further back and found more."

Joseph then testified that the February 9 and March 4 timesheets were not among the documents in the original production because "there's a month of a difference in some of these documents. It's further back in the book."

¶ 43    Finally, Joseph testified that Harris presented him with a check on Friday, February 27, 2009. However, Joseph was unable to deposit the check because of insufficient funds in

Harris' account. At the time Harris presented Joseph with the check, Harris requested that Premier come back the next week to complete the project. Joseph testified that the next Monday and Tuesday were too cold to complete the work, and that Premier was not able to complete its project until March 4 because the bricklayer had not yet "finished with the wall [*sic*] to cleaning them up and pointing them."

¶ 44                                   C. Defendants' Motion for Summary Judgment

¶ 45        On August 16, 2012, defendants filed a motion for summary judgment against Premier arguing that Premier failed to strictly comply with section 7 of the Act, which states:

> "No contractor shall be allowed to enforce such lien against or to
> the prejudice of any other [third-party] creditor or incumbrancer or
> purchaser, unless [(1)] within 4 months after completion *** he or
> she shall either bring an action to enforce his or her lien therefor or
> shall file in the office of the recorder *** a claim for lien, [(2)]
> verified by the affidavit of himself or herself, or his or her agent or
> employee, which shall consist of [(3)] a brief statement of the
> claimant's contract, [(4)] the balance due after allowing all credits,
> and [(5)] a sufficiently correct description of the lot ***. *** No
> such lien shall be defeated to the proper amount thereof because of
> an error or overcharging on the part of any person claiming a lien
> therefor under this Act, unless it shall be shown that such error or
> overcharge is made with intent to defraud ***." 770 ILCS 60/7(a)
> (West 2008).

To their motion for summary judgment, defendants attached the entirety of Premier's document production, its responses to the written interrogatories, and the deposition testimony of Joseph.

¶ 46      First, defendants argued that Premier had not timely filed or recorded its claim as required by section 7 of the Act. Defendants asserted that Premier is bound by, cannot contradict, and cannot amend the February 27, 2009, completion date that Premier originally stated. Therefore, defendants argued, because Premier cannot produce evidence that it did in fact work on February 27, 2009, its lien claim is unperfected and unenforceable against defendants because it was not timely filed. Second, defendants argued that Premier's claim is unperfected under section 7 because the claim incorrectly described Joseph as contracting in a personal capacity with SMH.

¶ 47      Premier replied to defendants' motion that the actual date of completion was March 4, 2009. In support of this date, Premier attached the affidavits of Ann Birt, Jack Hartnett, a foreman for Premier on the property, and Christopher Birt, Joseph's brother and an employee of Premier.

¶ 48      Ann's affidavit stated that after the original document production, Joseph "informed her that he believed that December 29, 2008, was not the last day of work on [the] project because the work was not finished when he received" the check from Harris on February, 27, 2009. She stated: "At my husband's request I re-examined our time record books including the records for 2009 and noted that I overlooked a time sheet for March 4, 2009, a true and accurate copy of which is attached to this affidavit."

¶ 49      Hartnett's affidavit stated that, as a foreman on the project, "the last day [he] recall[ed] working on the project was on March 4, 2009." He stated that he completed the time record

16

that Ann stated she initially overlooked. Moreover, Hartnett stated that on December 29, 2008, "snow and ice prevented installing permanent flashing around the skylight curbs that had been cut into the roof but [he] recall[ed was] not finished." He stated that temporary flashings were installed until Premier could install ones that were permanent. Hartnett stated that the reason the work was not completed until March 4, 2009, was because "there was adverse weather (snow, ice and cold) which prevented the brick masons from repairing work" and because the "mortar joints were deteriorated so that [Premier] could not attach the termination bar and counter-flashing without brick masons first repairing that part of the wall."

¶ 50       Christopher Birt's affidavit stated he recalled "after December 29, 2008, work was suspended due to weather [conditions] and due to the fact that other trades did not complete installing the HVAC (heating, ventilation, and air conditioning) units on the roof until February 2, 2009." Christopher stated that "[o]ften work is interrupted due to adverse weather conditions such as freezing temperatures which may cause the Johns Mansville roofing material [Premier] used on the roof to crack and/or not adhere properly to the underlayment" and that "work is often delayed until other trade complete their involving roof penetrations – such as piping, mechanical units, skylights curbs, and other such items." Finally, he stated that he completed the project on March 4, 2009, "including the flashing and priming [of the roof]."

¶ 51       On November 20, 2012, Premier made a motion to withdraw its prior countercomplaint and file an amended countercomplaint to change its date of completion. Earlier that year, on February 7, 2012, the trial court granted Premier seven days leave to amend its counter-complaint. Premier did not file an amendment.

17

¶ 52                                    IV. Disposition and Appeal

¶ 53          On July 3, 2012, the trial court denied Bluewater's motion for summary judgment, but

granted defendants' cross-motion for summary judgment. The trial court entered an order

finding that Bluewater's lien was not enforceable because it was not timely filed. On October

30, 2012, the trial court denied Bluewater's motion for reconsideration and motion for leave

to amend the completion date on its complaint to January 5, 2009.

¶ 54          As to Premier, the trial court granted defendants' motion for summary judgment on

November 30, 2012. In its oral opinion, the trial court reasoned that whatever the Bank's

standing might be, SAI and ERPCED do have standing. Moreover, "although the lien claim

is facially valid," the court found that Premier was bound to the completion date stated in its

lien claim (February 27, 2009) and denied Premier's motion for leave to amend its complaint

with the new completion date (March 4, 2009). The trial court reasoned in its oral opinion:

              "[C]onsidering the Mutual Services and Braun-Skiba cases[,] ***

              the fact that a [completion date] is included in [plaintiffs' lien

              claims] and is a fact and was sworn to by the [plaintiffs] made that

              statement a judicial admission which could not be contradicted by

              evidence propounded by the [plaintiffs], which in this case means

              that [plaintiffs] cannot attempt to contradict its sworn statement of

              the [completion date on their] lien[s] *** by way of evidence that

              [the work] may have been completed after that date.

                                          * * *

                 [As to the motion for leave, the court] believe[s] that the motion

              for leave to withdraw the counterclaim and file an amended

counterclaim is mooted as a result of the ruling on the motion for summary judgment.

\* \* \*

\*\*\* [Y]ou know, [the court will not] say that [the motion for leave to amend] is moot. It's denied, it's denied for the same reasons [the court] ha[s] to grant summary judgment, that you [Premier] cannot salvage this lien by virtue of the evidence of work that was alleged to have been done after the sworn date.

\* \* \*

[The completion date is] a judicial admission that cannot be under the law of Illinois controverted by the party that made the admission by way of other evidence. It has nothing to do with whether it is a lien claim or any other claim."

¶ 55    After granting defendants' motion for summary judgment against Premier, the court entered an order finding there is no just reason for delaying the appeal or enforcement of the court's orders regarding plaintiffs' liens pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). As a result, Bluewater and Premier bring this interlocutory appeal.

¶ 56                                   ANALYSIS

¶ 57    In our analysis, we consider (1) whether the Bank released its mortgage and has standing in this action; (2) whether plaintiffs' mechanics liens are enforceable as a matter of law; (3) whether the trial court erred when it denied plaintiffs' motions for leave to amend their counterclaims; and (4) whether the trial court erred when it granted defendants' motions for summary judgment and denied Bluewater's motion for summary judgment.

19

¶ 58    For the reasons that follow, we reverse the grant of summary judgment in defendants' favor and affirm the denial of Bluewater's motion for summary judgment.

¶ 59                                I. Standard of Review

¶ 60    A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 61    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint. If there is a

material fact that needs to be decided, a motion for summary judgment must be denied. *Forsythe v. Clark USA, Inc.,* 224 Ill. 2d 274, 280 (2007) (citing *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 424 (1998)).

¶ 62    " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 63    The issue of standing is a matter of law and is also subject to *de novo* review. *Malec v. City of Belleville,* 384 Ill. App. 3d 465, 468 (2008) (quoting *Dimensions Medical Center, Ltd. v. Advanced Ambulatory Surgical Center, Inc.,* 305 Ill. App. 3d 530, 534 (1999)). Again, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 64                                II. Standing

¶ 65    As a preliminary matter, we must address plaintiffs' contention that the Bank lacks standing. We note at the outset that the Bank, SAI, and ERPCED collectively filed the motions for summary judgment against the plaintiffs. Since plaintiffs challenge the standing of only the Bank and not the standing of either SAI or ERPCED, any determination of the Bank's standing is not ultimately dispositive of this appeal. We must, therefore, consider the

validity of plaintiffs' mechanics lien claims regardless of our conclusion on the issue of the Bank's standing.

¶ 66    "The doctrine of standing is designed to preclude persons who have no interest in a controversy from bringing suit," and "assures that issues are raised only by those parties with a real interest in the outcome of the controversy." *Glisson v. City of Marion,* 188 Ill. 2d 211, 221 (1999). "[S]tanding requires some injury in fact to a legally cognizable interest ***." *Glisson,* 188 Ill. 2d at 221. However, our Illinois Supreme Court has stated that the "lack of standing in a civil case is an affirmative defense, which will be forfeited if not raised in a timely fashion in the trial court." *Greer v. Illinois Housing Development Authority,* 122 Ill. 2d 462, 508 (1988); *People v. Kelly,* 397 Ill. App. 3d 232, 265 (2009). As an affirmative defense, the lack of standing is the defendant's burden to plead and prove. *Lebron v. Gottlieb Memorial Hospital,* 237 Ill. 2d 217 (2010).

¶ 67    On appeal, plaintiffs urge this court to hold that the Bank released its mortgage to the property, and that as a result of the Bank's release, the Bank no longer has an interest in this action.  Plaintiffs argue that "[o]nce a mortgagee receives full payment it seeks under its mortgage, the mortgage is deemed released." Plaintiffs not only point out that the Bank executed a signed release, but plaintiffs also claim that the Bank received full payment for the mortgage as evidenced by the sale of the property to SAI.

¶ 68    As an initial matter, we are persuaded by defendants' argument that Bluewater has waived its arguments concerning standing by not raising lack of standing as a defense before the trial court. See *Greer*, 122 Ill. 2d at 508. However, we are not persuaded by defendants' arguments that Premier waived its arguments concerning standing. Premier raised the issue of standing before the trial court and therefore preserved the issue on appeal. Moreover,

waiver is a limitation on the parties, not on the jurisdiction of the reviewing court. *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 112 (2007).

¶ 69    Defendants concede that the Bank executed a mortgage release, but argue that the mortgage release is not yet effective because it has not been delivered. Defendants also contend that plaintiffs have not presented sufficient evidence that the Bank received full payment for the mortgage. Premier does not contest whether the mortgage has been delivered, but instead argues that delivery is not necessary for the mortgage release to be effective.

¶ 70    However, the authorities Premier cites simply do not support its legal theory that full payment or anything short of delivery is sufficient to give effect to a mortgage release. Points not supported by citation to relevant authority are waived. *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forefeited"); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or any reasoned argument, plaintiffs waived consideration of their theory for asserting personal jurisdiction over defendants); *Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires); Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (arguments in an appellate brief must be supported by citations to legal authority).

¶ 71    First, Premier cites section 2 of the Mortgage Act as supporting its contention that, once a mortgagee receives full payment for the mortgage, the mortgage is deemed released. 765 ILCS 905/2 (West 2008). The primary rule of statutory construction requires that effect must be given to the intent of the legislature. *Advincula v. United Blood Services,* 176 Ill. 2d 1, 16 (1996); *Wal-Mart Stores, Inc. v. Industrial Comm'n,* 324 Ill. App. 3d 961, 967 (2001). In ascertaining the legislature's intent, courts begin by examining the plain language of the statute, reading the statute as a whole, and construing it so that no word or phrase is rendered meaningless or superfluous. *Kraft, Inc. v. Edgar,* 138 Ill. 2d 178, 189 (1990); *Wal-Mart Stores, Inc.,* 324 Ill. App. 3d at 967. Statutory language that is clear and unambiguous must be given effect without resort to other aids of construction. *People v. Woodard,* 175 Ill. 2d 435, 443 (1997); *Wal-Mart Stores, Inc.,* 324 Ill. App. 3d at 967. Section 2 of the Mortgage Act says, in relevant part:

> "Every mortgagee of real property *** having received full
> satisfaction and payment of all such sum or sums of money as are
> really due to him from the mortgagor *** shall *** make, execute
> and deliver to the mortgagor *** an instrument in writing ***
> releasing such mortgage *** ." 765 ILCS 905/2 (West 2008).

¶ 72    While the plain language of section 2 does indicate that full payment is a *necessary* condition before a mortgagee is obligated to release a mortgage, it does not suggest that full payment, by itself, is a *sufficient* condition to release a mortgage. On the contrary, once a mortgagee receives full payment it must further "make, execute and deliver *** an instrument in writing *** releasing such mortgage." 765 ILCS 905/2 (West 2008). To adopt

24

Premier's construction would render the statutory requirements to "make, execute and deliver" meaningless and superfluous. 765 ILCS 905/2 (West 2008).

¶ 73    Likewise, section 4 of the Mortgage Act does not support Premier's contentions. While the provision does make a mortgagee liable to aggrieved parties when it fails to release a mortgage within one month of receiving full payment for the mortgage, it does not say that full payment *by itself* releases the mortgage. See 765 ILCS 905/4 (West 2008). Again, under section 4, full payment triggers only the obligation of a mortgagee to release a mortgage.

¶ 74    Finally, Premier does not dispute that the Bank failed to deliver the mortgage release, but instead points to *American Garden Homes*, *Inc. v. Gelbart Fur Dressing*, 238 Ill. App. 3d 64 (1992), as supporting its contention that delivery is not necessary for a mortgage release to be effective. We do not find Premier's reliance on this case persuasive.

¶ 75    The court in *American Garden* did not consider whether a mortgage release was effective before delivery but, rather, whether a party had standing to *compel* the release of a mortgage. See *American Garden*, 238 Ill. App. 3d at 68-69. Indeed, the question before the *American Garden* court was whether the plaintiff could compel the defendant to *deliver* the mortgage release. *American Garden*, 238 Ill. App. 3d at 69. Nothing in the case supports Premier's contention that *American Garden* deemed a mortgage release effective prior to delivery.

¶ 76    In the case at bar, Premier's challenge to the Bank's standing rests entirely on the theory that the Bank released its mortgage by receiving full payment. However, even if there was full payment, the plain language of the Mortgage Act indicates that delivery is necessary before a mortgage is released. Since it is undisputed that there was no delivery, the mortgage has not been released. Accordingly, the Bank still has an interest in the property and has standing.

25

¶ 77          III. Enforceability of Mechanics Liens

¶ 78  Before we can consider whether the trial court erred in denying plaintiffs' motions for leave to amend their complaints and before we can consider whether the trial court erred in granting defendants' motions for summary judgment against plaintiffs, we must consider the trial court's basis for these decisions. Specifically, the trial court found that the completion dates on plaintiffs' lien claims constituted binding judicial admissions that plaintiffs could not amend or contradict with evidence of a later completion date. The trial court reasoned that since plaintiffs were bound by the dates stated on their lien claims and could not produce evidence that work actually occurred on those dates, the trial court was required to enter summary judgment in favor of defendants and deny plaintiffs' motions for leave to amend their complaints.

¶ 79  Plaintiffs contend that their liens are facially enforceable and comply with the requirements of the Act. In determining whether plaintiffs' liens are enforceable on their face, we consider (1) the Act's general purpose, requirements, and principles; (2) whether we are to construe the requirements of the Act strictly or liberally; (3) whether the completion dates stated in plaintiffs' lien claims and elsewhere constitute binding judicial admissions; and (4) whether plaintiffs' claims are unenforceable because (a) of plaintiffs' description of their contract and (b) Bluewater's claimed overstatement of the amount due under its claim.

¶ 80        A. Purpose, Requirements, and Principles

¶ 81  "The purpose of the Act is to permit a lien upon premises where a benefit has been received by the owner and the value or condition of the property has been increased or improved by the furnishing of labor and materials." *Northwest Millwork Co. v. Komperda,*

338 Ill. App. 3d 997, 1000 (2003) (citing *R.W. Dunteman Co. v. C/G Enterprises, Inc.,* 181 Ill. 2d 153, 164 (1998)).

¶ 82     Section 7 of the Act contains most of the requirements at issue in the case at bar. The provision provides:

> "No contractor shall be allowed to enforce such lien against or to the prejudice of any other [third-party] creditor or incumbrancer or purchaser, unless [(1)] within 4 months after completion *** he or she shall either bring an action to enforce his or her lien therefor or shall file in the office of the recorder *** a claim for lien, [(2)] verified by the affidavit of himself or herself, or his or her agent or employee, which shall consist of [(3)] a brief statement of the claimant's contract, [(4)] the balance due after allowing all credits, and [(5)] a sufficiently correct description of the lot ***. *** No such lien shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a lien therefor under this Act, unless it shall be shown that such error or overcharge is made with intent to defraud ***." 770 ILCS 60/7(a) (West 2008).

¶ 83     Additionally, this court has interpreted section 7 to impose a requirement that a mechanics lien claim include a completion date in order to be enforceable. *Merchants Environmental Industries, Inc. v. SLT Realty Limited Partnership*, 314 Ill. App. 3d 848, 869 (2000) (inferring from section 7 that lien claims require the statement of a completion date); but see *National City Mortgage v. Bergman*, 405 Ill. App. 3d 102, 111 (2010) (explicitly

disagreeing with the holding in *Merchants Environmental*, the Second District reasoned that "hold[ing] that a lien claim is unenforceable because it failed to set forth a completion date [is] inequitable when the lien holder has complied with the statutory requirements of a lien claim, which do not include providing a completion date").

¶ 84     Section 24 of the Act provides the last requirement relevant to this appeal. It provides that a subcontractor must, within 90 days after the date of completion, "cause a written notice of his or her claim *** to be sent *** to the lending agency." 770 ILCS 60/24(a) (West 2008).

¶ 85     In regards to both sections 7 and 24, "[t]he term 'completion' *** does not refer to completion of the contract. It means completion of the work for which a contractor seeks to enforce his lien ***." (Internal quotation marks omitted.) *Cordeck Sales, Inc. v. Construction Systems, Inc.,* 382 Ill. App. 3d 334, 389 (2008) (quoting *Merchants Environmental*, 314 Ill. App. 3d at 858).

¶ 86     Additionally, as the rights under the Act are in derogation of the common law, the requirements to "perfect" the lien must be strictly construed. *Westcon/Dillingham Microtunneling v. Walsh Construction Co. of Illinois,* 319 Ill. App. 3d 870, 877 (2001). "However, notwithstanding the strict construction generally given to all sections of the Mechanics Lien Act, there is authority that favors some flexibility in applying the general rules, so that the statute's provisions are not construed so technically that its remedial purpose is undermined and all but lost in the process." *Walker Process Equipment v. Advance Mechanical Systems, Inc.*, 282 Ill. App. 3d 452, 455 (1996) (citing *Aluma Systems, Inc. v. Frederick Quinn Corp.*, 206 Ill. App. 3d 828, 840 (1990)). In any event, once a plaintiff has complied with its requirements, the Act should be liberally construed to accomplish its

remedial purpose. *Westcon/Dillingham,* 319 Ill. App. 3d at 877; see also 770 ILCS 60/39 (West 2008) ("This act is and shall be liberally construed as a remedial act.").

¶ 87      Finally, we note that while defendants' arguments are identical in that both Bluewater and Premier were untimely in complying with the Act, defendants technically claim that Bluewater and Premier were untimely under different provisions of the Act. Bluewater filed as a subcontractor and Premier filed as a general contractor. Both plaintiffs are subject to the requirements in section 7, which requires a lien claim to be filed or recorded within four months of completion. See 770 ILCS 60/7 (West 2008). However, Bluewater, as a subcontractor, was also required to provide notice of the lien claim to the lending agency (in this case, the Bank) within 90 days of completion. See 770 ILCS 60/24 (West 2008).

¶ 88      Since the parties apply the same legal analysis and arguments to both sections 7 and 24, we examine both provisions together in deciding whether plaintiffs' lien claims are enforceable on their face. Indeed, the purpose of both provisions is the same: to provide third parties notice of the existence of a lien claim. As will be explained below, the purpose of section 7 is to provide notice to third parties whether a lien claim is enforceable. See *Merchants Environmental*, 314 Ill. App. 3d at 861. Likewise, the purpose of section 24 is to provide notice to a third party, in this case the Bank, of the existence of a lien claim. See 770 ILCS 60/24 (West 2008).  Accordingly, both provisions present the same *analytical* questions because they share the same purpose of providing notice to third parties.

¶ 89      However, sections 7 and 24 present different *factual* questions in the present case (*i.e.*, whether Bluewater notified the Bank within 90 days of completion and whether Premier filed its lien claim within four months of completion). As a result, we examine each provision

separately when we consider whether plaintiffs presented sufficient evidence to defeat defendants' respective motions for summary judgment.

¶ 90                                B. Strict Construction v. Liberal Construction

¶ 91          Plaintiffs urge this court to apply a liberal construction of the Act's requirements.  They correctly point out that our supreme court in *United Cork Cos. v. Volland*, 365 Ill. 564 (1937), refused to employ strict construction to invalidate a lien with an incorrect completion date. Contemporary cases still discuss and apply the 1937 *United Cork* case. See *Braun-Skiba, Ltd. v. La Salle National Bank*, 279 Ill. App. 3d 912 (1996); *Mutual Services, Inc. v. Ballantrae Development Co.*, 159 Ill. App. 3d 549 (1987). Defendants do not appear to contest plaintiffs' reading of *United Cork*, but nevertheless argue that it is inapposite to the case at bar. Accordingly, defendants argue that this court should strictly construe the Act against the plaintiffs.

¶ 92          We consider the applicability of *United Cork* and the doctrine of strict construction to the completion dates in the present case. In *United Cork*, the contractor filed a mechanics lien in February 1931 that stated a completion date of December 1, 1930. [5] *United Cork*, 365 Ill. at 570. Notwithstanding this stated completion date, the contractor testified that most of the work was completed by July 1930, and that significant work continued after this date, including on December 31, 1930. *United Cork*, 365 Ill. at 570. The contractor further testified that the work under the contract was not ultimately completed until April 1931, over a month after the lien claim was filed. *United Cork*, 365 Ill. at 570. However, the lien claim

---

[5] We note there appears to be a slight discrepancy in *United Cork* as to the completion date stated on the lien. The *United Cork* court first cites the completion date on the lien claim as December 1, 1930, but later in its opinion and without explanation, the court notes that a lower court stated the lien claim was December 31, 1930.

did not seek to charge for any of the work completed after it was filed in February. *United Cork*, 365 Ill. at 573.

¶ 93    The court held that although significant work continued after the completion date stated in the lien, and that although the ultimate completion of the contract did not occur until well after the contractor filed the claim, the mechanics lien was still valid and enforceable. *United Cork*, 365 Ill. at 570-74. The court held that the contractor complied with the statute by filing within four months of completing the work. See *United Cork*, 365 Ill. at 572-73.  In coming to this conclusion, the court reasoned:

> "The doctrine of strict construction was never meant to be applied
> as a pitfall to the unwary, in good faith pursuing the path marked
> by the statute, nor as an ambuscade from which an adversary can
> overwhelm him for an immaterial misstep. Its function is to
> preserve the substantial rights of those against whom the remedy
> offered by the statute is directed, and it is never employed
> otherwise. ***
>
>      *** No charge was attempted to be made for the work
> performed [after the contractor filed the lien], and no substantial
> right of the defendants was affected by the error.
>
>      *** [A] variance between allegations and proof, in order to be
> fatal, must be substantial and material." *United Cork*, 365 Ill. at
> 572-73.

¶ 94    We are persuaded by plaintiffs' argument that *United Cork* is instructive to our analysis in the present case. Defendants are correct to point out that *United Cork* considered the

completion of work after the lien was filed, and that this case does not present that situation. However, defendants overlook the fact that *United Cork* did not invalidate *any* work completed before the contractor filed its lien even though the claim's stated completion date was clearly incorrect. The only way in which *United Cork* is distinguishable from the instant case is that plaintiffs here claim to have completed *all* of the work before they filed their liens.

¶ 95    *United Cork* remains important to our analysis because it provides a framework to evaluate if the errors made by plaintiffs are material to defendants' rights. If the errors are not material, *United Cork* dictates that we construe the errors liberally to avoid subverting the Act's remedial purpose. As quoted above, the *United Cork* court reasoned that strict construction is only employed to preserve the rights of parties from whom relief is sought.

¶ 96    The relevant right in the present case is the right of third parties to have notice of a mechanics lien attached to a property. In *Merchants Environmental*, this court stated:

> "[A] lien claim [must] be filed within a specified time [so] that 'third persons dealing with the property may have notice of the existence, nature and character of the lien as well as the times when the material was furnished and labor performed, and thus be enabled to learn from the claim itself whether it was such as can be enforced.' " (Emphasis omitted.) *Merchants Environmental*, 314 Ill. App. 3d at 868-69 (quoting *Schmidt v. Anderson*, 253 Ill. 29, 32 (1911)).

¶ 97        Accordingly, we must consider whether the plaintiffs' errors in this case infringed on defendants' right to know from the claim itself whether it was an enforceable lien. This is a right of notice.

¶ 98        Defendants were able to learn from the claims themselves that the liens were facially enforceable even with the incorrect dates. Whether Bluewater completed work on January 4, 2009, or January 5, 2009, Bluewater sent notice to the Bank within 90 days of completion as required by section 24. Likewise, whether Premier listed February 27, 2009, or March 4, 2009, on its lien claim is of no consequence to defendants' right to know whether the claim was an enforceable lien because both dates are within the four months required by section 7. Either date would have communicated to a third party like SAI or ERPCED that the lien was timely filed and enforceable.

¶ 99        As a result, the incorrect dates of completion in plaintiffs' claims cannot be said to materially affect defendants' right of notice under the Act. Therefore, at least in regard to the completion dates on plaintiffs' lien claims, we construe the Act's requirements liberally to give effect to the Act's remedial purpose.

¶ 100                                  C. Judicial Admissions

¶ 101        The trial court found that the completion dates sworn to by plaintiffs in their lien claims constituted binding judicial admissions. In its oral opinion, the trial court reasoned:

> "[C]onsidering the Mutual Services and Braun-Skiba cases[,] ***
> the fact that a [completion date] is included in [plaintiffs' lien
> claims] and is a fact and was sworn to by the [plaintiffs] made that
> statement a judicial admission which could not be contradicted by
> evidence propounded by the [plaintiffs], which in this case means

that [plaintiffs] cannot attempt to contradict its sworn statement of

the [completion date on their] lien[s] *** by way of evidence that

[the work] may have been completed after that date.

* * *

*** [I]t's a judicial admission that cannot be under the law of

Illinois controverted by the party that made the admission by way

of other evidence. It has nothing to do with whether it is a lien

claim or any other claim."

¶ 102      Judicial admissions are defined as "deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *In re Estate of Rennick,* 181 Ill. 2d at 406 (citing *Hansen v. Ruby Construction Co.,* 155 Ill. App. 3d 475, 480 (1987)). They are " 'formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the [function] of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' " *Knauerhaze v. Nelson,* 361 Ill. App. 3d 538, 557-58 (2005) (quoting John Williams Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992)); see also *Lawlor v. North American Corp. of Illinois,* 409 Ill. App. 3d 149, 163 (2011). In other words, if a fact is judicially admitted, the adverse party has no need to submit any evidence on that point. The admission serves as a substitute for proof at trial. *Lowe v. Kang,* 167 Ill. App. 3d 772, 776 (1988) (judicial admissions "dispens[e] with proof of a fact claimed to be true, and are used as a substitute for legal evidence at trial" (cited with approval in *People v. Howery,* 178 Ill. 2d 1, 40-41 (1997))).  A verified pleading remains part of the record despite any amendments to the pleadings "and any admissions not the product of mistake or inadvertence become binding judicial admissions." *Rynn v. Owens,* 181 Ill. App. 3d 232, 235 (1989) (citing

*American National Bank & Trust Co. of Chicago v. Erickson,* 115 Ill. App. 3d 1026, 1029 (1983)).

¶ 103     The purpose of judicial admissions "is to remove the temptation to commit perjury." *In re Estate of Rennick,* 181 Ill. 2d at 407 (citing *Smith v. Ashley,* 29 Ill. App. 3d 932, 935 (1975)).  Therefore, a party "cannot create a factual dispute by contradicting a previously made judicial admission" in a motion for summary judgment or at trial. *Burns v. Michelotti,* 237 Ill. App. 3d 923, 932 (1992); see also *In re Estate of Rennick,* 181 Ill. 2d at 406.

¶ 104     To help explain and frame our analysis, we note that the trial court relies on *Mutual Services*, 159 Ill. App. 3d 549, and *Braun-Skiba*, 279 Ill. App. 3d  at 912. The *Mutual Services* and *Braun-Skiba* courts relied entirely on the case law and principles unique to mechanics liens to bind plaintiffs to the completion dates on their claims.

¶ 105     Consequently, we consider whether the completion dates in plaintiffs' lien claims constitute judicial admissions under *Mutual Services* and *Braun-Skiba,* as well as whether the completion dates are binding under the broader doctrine of judicial admissions.

¶ 106                              1. Under *Mutual Services* and *Braun Skiba*

¶ 107     Defendants argue that plaintiffs are barred from presenting evidence of any completion date *after* the incorrect date stated on their liens. For example, defendants argue that Bluewater cannot assert January 5, 2009, as its new completion date because that is after the January 4, 2009, completion date stated in the lien. Defendants rely on *Mutual Services* and *Braun-Skiba.*

¶ 108     We are not persuaded by defendants' arguments that *Mutual Services* and *Braun-Skiba* bar plaintiffs from presenting evidence of a later completion date. Defendants correctly note that the courts in *Mutual Services* and *Braun-Skiba* found that the plaintiffs in those cases

were bound by the completion dates stated on their lien claims and that those plaintiffs could not contradict the dates with later evidence. See *Mutual Services*, 159 Ill. App. 3d at 553-54; *Braun-Skiba*, 279 Ill. App. 3d at 917-18. However, unlike the claims in the present case, the lien claims in *Mutual Services* and *Braun-Skiba* were invalid on their face and, thus, are easily distinguished. See *Mutual Services*, 159 Ill. App. 3d at 551; *Braun-Skiba*, 279 Ill. App. 3d at 918.

¶ 109      In *Mutual Services*, the plaintiff filed a mechanics lien that stated a completion date more than four months prior to the filing of the claim. *Mutual Services*, 159 Ill. App. 3d at 551. In *Braun-Skiba*, the plaintiff mistakenly filed a lien with a typographical error, stating a completion date more than two years prior to filing. In both cases, "the lien[s] appeared to be invalid on [their] face, [and] the plaintiff[s] argued that [the liens] should be enforced because [they] misstated the required date on the lien and the actual date of completion was one within the mandatory filing period." *Braun-Skiba*, 279 Ill. App. 3d at 917 (citing *Mutual Services*, 159 Ill. App. 3d at 552).

¶ 110      These are not insignificant distinctions. As the court in *Mutual Services* noted, "The purpose of the requirement [to file within the statutory period] is to give third parties dealing with the property notice of the existence, nature and character of a lien and thus enable third parties to determine from the claim itself whether the lien is enforceable." *Mutual Services*, 159 Ill. App. 3d at 553. The lien claims in *Mutual Services* and *Braun-Skiba* could not have possibly informed third parties that the lienable work was actually completed within four months of the filing of the liens. On the contrary and on their face, the lien claims stated that the work was completed well outside the enforceable statutory period. Therefore, if the courts in *Mutual Services* and *Braun-Skiba* were to allow the plaintiffs in those cases to

amend their lien claims to reflect later completion dates, it would have misled third parties to believe the claims were unenforceable. In *Braun-Skiba*, the court explicitly noted the difference between facially valid and invalid claims as they related to *United Cork* and *Mutual Services*:

> "What is also important in *United Cork* is that the lien was valid on its face and could properly serve as notice to third parties. In the present case [(*Braun-Skiba*)], however, the lien is invalid on its face and, therefore, under the principles addressed in *Mutual Services*, it is not enforceable against defendant, a third party."
>
> *Braun-Skiba*, 279 Ill. App. 3d at 918.

¶ 111    However, in the present case, both claims *did* appear to be timely filed and enforceable. Since section 7 required the liens to be filed within four months of completing work that was done at the property, both liens were valid on their face. Additionally, based on the completion date stated on the face of Bluewater's lien clam, Bluewater timely notified the Bank within 90 days as required under section 24 of the Act. In fact, not only were the completion dates stated on plaintiffs' liens within the requisite statutory periods, the amendment plaintiffs requested would also be within the requisite statutory periods. As a result, third parties would not be misled to believe the liens were unenforceable, and the rights of third parties would not be compromised.

¶ 112                                  2. Judicial Admissions in General

¶ 113    Having found that *Mutual Services* and *Braun-Skiba* do not bar plaintiffs from asserting later completion dates under the facts of the case at bar, we next consider whether the broader doctrine of judicial admissions precludes plaintiffs from presenting evidence of any

37

completion date other than the date stated in their lien claims. First, we consider the basic principles that underlie the doctrine of judicial admissions. Second, we discuss the diverging standards of our review of judicial admissions. Third, we apply the principles, function, purposes, and standards of review to the trial court's findings in the case at bar. Finally, we consider defendants' additional arguments that other statements made by plaintiffs, but not considered by the trial court, also constitute binding judicial admissions.

¶ 114                    a. Principles, Function, and Purpose of Judicial Admissions

¶ 115        "An admission by a party is substantive evidence admissible as an exception to the rule excluding hearsay." *In re Estate of Rennick,* 181 Ill. 2d 395, 406 (1998). A party may contradict or explain an ordinary evidentiary admission; however, judicial admissions "conclusively bind a party." *In re Estate of Rennick,* 181 Ill. 2d at 406 (citing Michael H. Graham, Cleary & Graham's Handbook of Illinois Evidence § 802.11, at 616 (5th ed. 1990), and *McCormack v. Haan,* 20 Ill. 2d 75, 78 (1960)). Accordingly, " '[t]he doctrine of judicial admissions requires thoughtful study for its application so that justice not be done on the strength of a chance statement made by a nervous party.' " *Smith v. Pavlovich,* 394 Ill. App. 3d 458, 468 (2009) (quoting *Thomas v. Northington*, 134 Ill. App. 3d 141, 147 (1985)).

¶ 116                    b. Diverging Standards of Review in Judicial Admissions

¶ 117        We must also consider the standard of review that applies to the trial court's finding that the completion dates in plaintiffs' lien claims constituted judicial admissions. There are two lines of cases concerning the proper standard. *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 46. The first, established in 1987 by this court in *Hansen v. Ruby Construction Co.,* 155 Ill. App. 3d 475, 480 (1987), considers the issue as a question of law subject to *de novo* review. *Crittenden*, 2012 IL App (1st) 112437, ¶ 46 (citing *Choate*

*v. Indiana Harbor Belt R.R. Co.,* 2011 IL App (1st) 100209, ¶ 86; *Herman v. Power Maintenance & Constructors, LLC,* 388 Ill. App. 3d 352, 360 (2009); *Elliott v. Industrial Comm'n,* 303 Ill. App. 3d 185, 187 (1999)). *De novo* consideration means the reviewing court performs the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP,* 408 Ill. App. 3d 564, 578 (2011). The *de novo* standard of review derives from the requirement that a judicial admission be a " 'deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge' " and is based on the determination that the question of whether the statement is equivocal is one of law and not fact. *Crittenden*, 2012 IL App (1st) 112437, ¶ 46 (quoting *Hansen,* 155 Ill. App. 3d at 480).

¶ 118    The second line of cases, beginning in 1988 with *Lowe*, 167 Ill. App. 3d at 777, applies an abuse of discretion standard of review. *Crittenden*, 2012 IL App (1st) 112437, ¶ 47 (citing *Serrano v. Rotman,* 406 Ill. App. 3d 900, 907 (2011), *Smith,* 394 Ill. App. 3d at 468, and *Dremco, Inc. v. Hartz Construction Co.,* 261 Ill. App. 3d 531, 536 (1994)). "An abuse of discretion occurs when no reasonable person would take the view adopted by the court." *Trettenero v. Police Pension Fund,* 333 Ill. App. 3d 792, 801 (2002) (citing *In re Marriage of Blunda,* 299 Ill. App. 3d 855, 865 (1998)). The abuse of discretion standard focuses on the context of the purported admission:

> "What constitutes a judicial admission must be decided under the
> circumstances in each case, and before a statement can be held to
> be such an admission, it must be given a meaning consistent with
> the context in which it was found. [Citation.] It must also be
> considered in relation to the other testimony and evidence

presented." *Serrano*, 406 Ill. App. 3d at 907 (citing *Smith*, 394 Ill.

App. 3d at 468).

¶ 119        We note that both the cases advocating for *de novo* review and the cases applying the

abuse of discretion standard of review agree on the same basic framework to be applied in

determining whether a statement is deemed a judicial admission. Thus, a case applying the

abuse of discretion standard still requires the statement to be "clear, unequivocal, and

uniquely within the party's personal knowledge" (*Serrano,* 406 Ill. App. 3d at 907 (citing

*Williams Nationalease, Ltd. v. Motter,* 271 Ill. App. 3d 594, 597 (1995))), and a case

applying *de novo* review also looks at the context of the statement. See *Herman,* 388 Ill. App.

3d at 361 (noting that the doctrine should not be applied to an attorney's statement of legal

opinion in a summary judgment proceeding, "especially if the opinion was manifestly

incorrect within the context of the statement itself").

¶ 120                              c. Trial Court's Findings of Judicial Admissions

¶ 121        In the case at bar, regardless of the standard of review applied and in light of the

principles, purpose, and functions of both the Act and the doctrine of judicial admissions, we

cannot find that the completion dates in plaintiffs' lien claims constituted binding judicial

admissions. As previously concluded in our discussion of *United Cork*, we must liberally

construe the requirements of the Act in the case at bar to give effect to the Act's remedial

purpose. In doing so, we also thoughtfully apply the doctrine of judicial admissions " 'so that

justice not be done on the strength of a chance statement.' " *Smith,* 394 Ill. App. 3d at 468

(quoting *Thomas*, 134 Ill. App. 3d at 147).

¶ 122        First, we note that finding that the completion dates stated in plaintiffs' lien claims

constituted judicial admissions would create the very type of "ambuscade" for immaterial

missteps that *United Cork* so emphatically denounced. See *United Cork*, 365 Ill. at 572. When we view the criteria for judicial admissions alongside what plaintiffs are already required to do under the law of mechanics liens, the pitfalls for plaintiffs become apparent.

¶ 123     As noted, with regards to the dates, section 7 of the Act requires only that a contractor file a lien within four months of completion and that the lien be verified by an affidavit. 765 ILCS 60/7 (West 2008). In addition, this court has inferred that section 7 also requires a valid lien to state a date of completion. See *Merchants Environmental*, 314 Ill. App. 3d 848. Also as noted, judicial admissions are deliberate, clear, unequivocal statements about a concrete fact uniquely within plaintiffs' knowledge. *In re Estate of Rennick,* 181 Ill. 2d at 406 (citing *Hansen*, 155 Ill. App. 3d at 480).

¶ 124     Plaintiffs are required under section 7 of the Act to state and swear to a date within four months of completion in order to enforce their liens. See *Merchants Environmental*, 314 Ill. App. 3d 848; see also 770 ILCS 60/7 (West 2008). Indeed, to further bind plaintiffs to their mistaken, but facially valid date of completion because plaintiffs swore to that date as required by the Act would elevate form over substance. It would require "perfection" above and beyond what is necessary or desirable to preserve the rights of third parties to notice and would not give effect to the remedial purpose of the statute. Plaintiffs, after working on a property in good faith of future payment, and after complying with every requirement on the face of the Act, should not have their lien claims defeated because the actual date of completion was mistakenly recorded by plaintiffs, when the mistaken date and the correct date are both within the time periods required by sections 7 and 24 of the Act.

¶ 125     Second, we are not persuaded by defendants' argument that the doctrine of judicial admissions is necessary to deter perjury in this case. As noted, a verified pleading remains

part of the record despite any amendments to the pleadings. *Rynn,* 181 Ill. App. 3d at 235 (citing *Erickson,* 115 Ill. App. 3d at 1029). Thus, allowing plaintiffs to present evidence of a different completion date does not give them free rein to game the judicial process. Lien claimants still must present sufficient evidence that they completed the work within four months of filing to defeat summary judgment, and claimants still must persuade the finder of fact that they completed the work within that timeframe. See *Tefco Construction Co. v. Continental Bank & Trust Co.*, 357 Ill. App. 3d 714, 718-19 (2005) (claimants have burden to prove they complied with the Act's requirements). Allowing lien claimants to present evidence of a facially valid completion date other than the facially valid completion date already stated on their lien claims would permit claimants to avoid summary judgment, but would still risk jeopardizing their credibility before the fact finder. In fact, the first completion date stated by plaintiffs would remain on the record. See *Rynn,* 181 Ill. App. 3d at 235. Accordingly, claimants still have sufficient incentive at the outset to provide the correct completion date on their mechanics lien claim.

¶ 126       Third, we again note that "any admissions *not the product of mistake or inadvertence* become binding judicial admissions." (Emphasis added.) *Rynn,* 181 Ill. App. 3d at 235 (citing *Erickson,* 115 Ill. App. 3d at 1029). As "penalizing confusion or an honest mistake is not among the purposes of the doctrine of judicial admissions, it must appear that the party making the statement had no reasonable possibility of being mistaken in order for the statement to qualify as a judicial admission." *Herman,* 388 Ill. App. 3d at 361 (citing *Trapkus v. Edstrom's, Inc.,* 140 Ill. App. 3d 720, 723 (1986)). In the present case, both plaintiffs claim to have made a mistake and we cannot say their claims are not reasonable

42

¶ 127    It could be reasonable that Bluewater mistakenly stated its completion date on a mechanics lien as January 4, 2009, when completion was in fact January 5, 2009. Filing a mechanics lien is likely and preferably a last resort for contractors when they have not been paid. In the present case, Bluewater did not immediately file a claim for mechanics lien when it discontinued work. Instead, as stated in Bluewater's "timeline" of the project and corroborated by the emails in its original document production, Kiferbaum "made several attempts to resolve payment issues without success" in January, met with the owner of the property who promised "to work out partial payment in the near future" in February, and followed up with the owner in March after "he ha[d] not heard anything" from the owner since their February meeting. It was in April, three months after discontinuing work and just before the opportunity to file its lien claim expired, when Bluewater ultimately turned to the legal system to resolve the dispute. In this context, it may not be unreasonable that Bluewater misstated its date of completion by one day.

¶ 128    It could also be reasonable that Premier misstated its completion date. Premier stated the completion date on its lien claim as Friday, February 27, 2009, but now claims the completion date was actually Wednesday, March 4, 2009. Joseph testified in his deposition that Harris wrote him a check on that Friday and requested that Premier come back the next week to complete the project. Premier produced a copy of this check. He testified that the next Monday and Tuesday were too cold to complete the work, but that Premier employees were ultimately able to complete the project that Wednesday. In fact, Joseph testified about numerous times Premier's schedule was interrupted by weather conditions beyond its control. He also testified that cold weather prevented Premier from applying the silver coat to the roof. He testified that other contracting projects on the site repeatedly prevented Premier

from continuing its work, and that Premier could only complete its project on March 4 after the bricklayer had "finished with the wall to cleaning them up and pointing them." With the sporadic nature of Premier's schedule, it could be reasonable that Premier misstated its completion date by five days.

¶ 129    Furthermore, Bluewater and Premier are not large corporations with the extensive resources necessary to keep absolutely meticulous and unmistaken records. They are "ma" and "pa" small businesses. Kiferbaum is Bluewater's only employee, the Birts operate Premier from their home, and Ann is Premier's sole secretary. According to Joseph's deposition testimony, Ann did not know exactly what to look for when gathering the documents for discovery as "this has never happened [to them] before."

¶ 130    Finally, it is not at all certain that the dates were deliberate, clear, unequivocal statements about a concrete fact uniquely within plaintiffs' knowledge. *In re Estate of Rennick,* 181 Ill. 2d at 406 (citing *Hansen*, 155 Ill. App. 3d at 480). Both Kiferbaum and Joseph testified that they had to rely on documents to remember the date of completion, and both Bluewater and Premier produced affidavits from other individuals involved with the property addressing the dates work was scheduled and performed. Bluewater's lien claim stated it had "substantially" completed the work on January 4, 2009, and Kiferbaum testified in his deposition that he had to "estimate" the completion date from the timeline and documents. Premier's lien claim appears to be a fill-in-the-blank form document that would give little reason to a contractor to hedge or qualify the completion date with cautious equivocation.

¶ 131    For the foregoing reasons, we find, that under either standard of review, that the trial court erred when it found that the completion dates stated in plaintiffs' lien claims constituted binding judicial admissions.

¶ 132                    d. Additional Statements Alleged to be Judicial Admissions

¶ 133        Defendants also argue that plaintiffs made other judicial admissions of incorrect

completion dates. The trial court did not address these arguments, but we briefly consider

them as we may affirm a trial court's grant of summary judgment on any grounds in the

record. *Ray Dancer*, 230 Ill. App. 3d at 50. Defendants contend (1) that plaintiffs are bound

to the incorrect date of completion as repeated in their verified pleadings and in Bluewater's

motion for summary judgment; and (2) that both plaintiffs respectively made judicial

admissions of *additional* incorrect completion dates during discovery. We find defendants'

arguments unpersuasive.

¶ 134        First, the same doctrine of judicial admissions that we applied to the incorrect completion

dates in plaintiffs' mechanics lien claims applies to the repetition of those dates in plaintiffs'

pleadings. Since we did not find the incorrect dates on their mechanics liens constituted

judicial admissions, we do not find that the incorrect dates in their pleadings constitute

binding judicial admissions. The pleadings merely reflect what was stated on the lien claims.

¶ 135        Additionally, plaintiffs did not bind themselves to any other completion date during the

course of discovery. In the case of Bluewater, Kiferbaum was equivocal in his deposition

about the December 27, 2008, date. When we read his entire deposition, it is clear that

Kiferbaum never unconditionally admitted to the date. When asked whether it was

Bluewater's last day of work on the property, Kiferbaum first responded, "No." When asked

again, he responded, "Not necessarily." When Kiferbaum did say that the last day of work

was December 27, he did so only after he was pressed to answer "based on [the] checks"

placed before him in the deposition. Moreover, Bluewater produced emails in its original

document production that occurred after December 27, 2008, which indicated that work was

then ongoing on the property. Kiferbaum also testified to these emails in his deposition. Thus, Kiferbaum did not deliberately, clearly, and unequivocally admit to a binding completion date of December 27, 2008, in his deposition testimony.

¶ 136    Premier is not bound to the December 29, 2008, date stated in its first answer to defendants' written interrogatories. The December 29 date was plainly premised on the documents that Premier attached to its first answer. When Premier uncovered more documents that evidenced a later completion date, it timely served an amended answer reflecting these new documents. Indeed, parties should not be discouraged from presenting new evidence and documents which they may have originally overlooked.

¶ 137                      D.  Additional Arguments Against Enforceability

¶ 138                           1. Brief Statement of Contract

¶ 139    In relevant part, section 7 of the Act requires a mechanics lien claim to include a "a brief statement of the claimant's contract." 770 ILCS 60/7 (West 2008). Defendants argue (1) that Bluewater failed to comply with section 7 of the Act because it misdescribed its contract with the owner as "written," and (2) that Premier failed to comply with section 7 because the lien claim stated that the contract was between Joseph and Premier on one hand, and Harris and SMH Development on the other hand, when its counter-complaint alleged "the actual contract was between Premier and SMH Development."

¶ 140    It is important to note that defendants do not argue that plaintiffs failed to include a "brief statement" of their contracts, but instead argue that plaintiffs' claims are invalid because they did not provide *accurate* brief statements of their contracts. For the proposition that inaccurate statements about a contract invalidate a lien, defendants rely on *Ronning*

*Engineering Co., v. Adams Pride Alfalfa Corp.*, 181 Ill. App. 3d 753 (1989), and *Candice Co., v. Ricketts*, 281 Ill. App. 3d 359, 364 (1996).

¶ 141 Both the *Ronning* and *Candice* cases concerned significant inaccuracies in the plaintiffs' descriptions of their written contracts and are distinguishable from the case at bar. See *Ronning*, 181 Ill. App. 3d at 753 (holding that a lien claim "did not contain a sufficient 'brief statement of the contract' " because "the claim for lien described the wrong contract"); see also *Candice*, 281 Ill. App. 3d at 363-64 (holding that, where the original contractor assigned its rights to a lien claim to the plaintiff, the lien claim was defective because the plaintiff inaccurately described itself as the original contracting party). Neither *Ronning* nor *Candice* states that a description of a contract must be absolutely correct and perfect to be enforceable. On the contrary, the language used by both courts suggests that a lien claim need only a *sufficiently* correct description of a contract to be enforceable. See *Candice*, 281 Ill. App. 3d at 364 ("The *Ronning* court concluded that, based on these facts, the lien was invalid because it did not contain a sufficient statement of the contract forming the basis of the claims.").

¶ 142 In the present case, the errors defendants claim plaintiffs made are nowhere near as grievous as the errors in *Ronning* and *Candice.* Though Bluewater did not produce a singular "written" contract signed by the parties, Bluewater produced numerous written correspondences, emails, proposals, and change orders that evidence a written agreement and performance of that agreement with the owner. Additionally, while Joseph may not have described the exact *capacities* he and Harris were acting in when they contracted together, Premier's description of the parties is substantially correct. In the end, there is no doubt that Premier was contracting with Harris or one of the entities in which Harris was the sole

member-manager. Therefore, plaintiffs provided sufficiently accurate "brief statement[s] of [their] contract[s]" to comply with section 7 of the Act.

¶ 143                            2. Amount Due Under Bluewater's Lien

¶ 144       Defendants argue that Bluewater "knowingly grossly overstated" that it provided work with a value of $131, 755. Thus, defendants argue, Bluewater's claim is void under section 7 because it is "constructively fraudulent."

¶ 145       Section 7 of the Act provides that no lien "shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a lien therefor under this Act, unless it shall be shown that such error or overcharge is made with intent to defraud." 770 ILCS 60/7 (West 2008). The intent to defraud is shown " 'by executed documents that on their face overstate the amount *due in combination with some other evidence of record from which intent could be inferred*.' " (Emphasis in original.) *Cordeck Sales, Inc. v. Construction Systems, Inc.,* 382 Ill. App. 3d 334, 373 (2008) (quoting *Peter J. Hartmann Co. v. Capitol Bank & Trust, Co.* 353 Ill. App. 3d 700, 708 (2004)).

¶ 146       "A [mechanics lien] claimant who knowingly makes a false statement regarding a material matter should not be allowed to recover because the effect of his actions is to give the appearance of a greater encumbrance on the property than that to which he is entitled." (Internal quotation marks omitted.) *Peter J. Hartmann Co.*, 353 Ill. App. 3d at 706. However, "Illinois courts have long held that this provision is intended to protect the honest lien claimant who makes a mistake rather than a dishonest claimant who knowingly makes a false statement." *Bank of America National Trust & Savings Ass'n v. Zedd Investments, Inc.*, 276 Ill. App. 3d 998, 1000-01 (1995) (citing *Christian v. Allee*, 104 Ill. App. 177, 188 (1902)).

¶ 147    Where a lien claimant (1) knowingly (2) files a lien containing a "substantial overcharge," the claim should be defeated on the basis of constructive fraud. *Cordeck Sales, Inc.*, 382 Ill. App. 3d at 371 (citing *Peter J. Hartmann Co.*, 353 Ill. App. 3d at 708). However, in the present case, defendants have neither shown that Bluewater knowingly filed its lien with a substantial overcharge nor that the alleged overcharge is substantial enough to constitute constructive fraud.

¶ 148    Defendants attempt to use Kiferbaum's deposition testimony and a check paid from Bluewater to Kiferbaum as "the other evidence of record" to demonstrate that Kiferbaum had the knowing intent to defraud. See *Cordeck Sales*, 382 Ill. App. 3d at 373. However, Kiferbaum's testimony does not imply that Bluewater "knowingly grossly overstated" the amount due as defendants claim. On the contrary, Kiferbaum's testimony was that he estimated the amount to his "best recollection based on material purchased, based on *** what [his] judgment as the contractor, as the subcontractor was." Moreover, the fact that Kiferbaum testified he could be "off" as to his estimate is not evidence of fraud, but merely an admission that he and his calculations were fallible. Furthermore, we do not find Kiferbaum's statements that his father paid for and completed the cement work evidence of constructive fraud. Kiferbaum clearly states that the plan was for Bluewater to reimburse his father for the work. Additionally, the check paid from Bluewater to Kiferbaum is not evidence of constructive fraud, but rather appears to be reimbursement for material purchases.

¶ 149    Additionally, defendants cite no previous cases that found constructive fraud with overcharges similar to the alleged overcharge in the case at bar. However, plaintiffs cite several cases that demonstrate constructive fraud is typically found where there are

significantly greater overcharges than those found here. See, *e.g.*, *Bank of America National Trust & Savings*, 276 Ill. App. 3d at 999 (finding that "lien claims should be defeated on the basis of constructive fraud where a lien claimant files *multiple* liens that create the appearance of an encumbrance on the property which is substantially greater than the amount the claimant is owed" (emphasis added)); see also *Lohmann Golf Designs, Inc. v. Keisler*, 260 Ill. App. 3d 886 (1994) (finding that a contractor engaged in constructive fraud when it (1) filed three separate lien claims on three different properties, and (2) each lien claim sought the aggregate value of all three properties combined, overcharging each property and effectively tripling the aggregate amount due to the contractor). Thus, we cannot say that the amount stated on Bluewater's lien claim constitutes a substantial overcharge on its face, or on the evidence presented in the motion for summary judgment and the response.

¶ 150                                      E. Conclusion

¶ 151         In sum, plaintiffs' lien claims are enforceable on their face, since (1) the incorrect dates on plaintiffs' liens do not invalidate their claims; (2) plaintiffs' statements of incorrect dates do not constitute binding judicial admissions; (3) plaintiffs complied with section 7's requirement to provide a "brief statement of the contract" on their lien claims; and (4) the amount owed as stated in Bluewater's lien claim is not constructive fraud on its face, or on the evidence presented in the motion for summary judgment and the response.

¶ 152                             IV. Motions for Leave to Amend

¶ 153         Since plaintiffs' lien claims are facially enforceable, we next consider whether the trial court erred when it denied plaintiffs' motions for leave to amend their complaints with the new completion dates. Again, we note that the trial court's denial of plaintiffs' motions for

summary judgment was premised on its finding that plaintiff's statements constituted binding

judicial admissions:

> "[The motion for leave to amend is] denied for the same reasons
>
> [the trial court] ha[s] to grant summary judgment, that [plaintiffs]
>
> cannot salvage this lien by virtue of the evidence of work that was
>
> alleged to have been done after the sworn date."

We also note that section 12 of the Mechanics Lien Act provides that "[t]he court *shall*

permit amendments to *any* part of the pleadings, and *may* issue process, [and] make all orders

*** that are or may be authorized in other civil actions." (Emphases added.) 770 ILCS 60/12

(West 2008).

¶ 154    The trial court's decision of whether to grant a motion to amend pleadings is within the

discretion of the trial court, and the reviewing court will not reverse the trial court's decision

absent an abuse of discretion. *Shutkas Electric, Inc. v. Ford Motor Co.,* 366 Ill. App. 3d 76,

82 (2006). "An abuse of discretion occurs when no reasonable person would take the view

adopted by the court." *Trettenero v. Police Pension Fund,* 333 Ill. App. 3d 792, 801 (2002)

(citing *In re Marriage of Blunda,* 299 Ill. App. 3d 855, 865 (1998)). "In considering whether

the trial court has abused its discretion in denying plaintiff's motion for leave to file a second

amended complaint, we look to the following four factors: *** (1) [whether] the proposed

amendment would cure the defective pleading; (2) [whether] other parties would sustain

prejudice or surprise by virtue of the proposed amendment; (3) [whether] the proposed

amendment is timely; and (4) [whether] previous opportunities to amend the pleading could

be identified. [Citation.]" *Shutkas Electric, Inc. v. Ford Motor Co.,* 366 Ill. App. 3d 76, 82

(2006).

¶ 155     Defendants' argument that plaintiffs' proposed amendment would be futile and would not cure their defective pleadings is not persuasive. Defendants' argument is premised on the trial court's finding that plaintiffs are bound to their prior written completion dates. Since the completion dates stated on plaintiffs' lien claims are not binding judicial admissions, plaintiffs' proposed amendments are not futile and would cure the defective pleading.

¶ 156     Moreover, defendants would not sustain undue hardship or surprise if plaintiffs were granted leave to amend. Since the first dates given on the filing of the mechanics lien and the requested amended dates are both within the statutory periods required by the Act, both dates are timely and defendants cannot claim prejudice. See 770 ILCS 60/7, 24 (West 2008); see also *United Cork*, 365 Ill. at 573 (holding that "variance between allegations and proof, in order to be fatal [to a lien claim], must be substantial and material[ly affect defendants' rights]"); *Merchants Environmental*, 314 Ill. App. 3d at 861 (noting that requiring completion dates to be stated on lien claims protects the rights of third parties to notice that the lien claim is enforceable).

¶ 157     Finally while we acknowledge Premier was granted leave to amend its complaint early in 2012, we are not persuaded by defendants' argument that this opportunity alone is sufficient to preclude Premier from further opportunities to amend its complaint.

¶ 158     As noted, "any admissions *not the product of mistake or inadvertence* become binding judicial admissions." (Emphasis added.) *Rynn,* 181 Ill. App. 3d at 235-36 (citing *Erickson,* 115 Ill. App. 3d at 1028). Since "penalizing confusion or an honest mistake [is] not among the purposes of the doctrine of judicial admissions, it must [be shown] that the party making the statement had no reasonable possibility of being mistaken in order for the statement to

qualify as a judicial admission." *Herman,* 388 Ill. App. 3d at 361 (citing *Trapkus v. Edstrom's, Inc.,* 140 Ill. App. 3d 720, 723 (1986)).

¶ 159          As a result, we cannot find that a reasonable court would have denied plaintiffs' motions for leave to amend their complaints with new completion dates.

¶ 160                              V. Motions for Summary Judgment

¶ 161          Since (1) plaintiffs' lien claims are valid and enforceable on their face, and (2) plaintiffs should have been granted leave to amend their complaints with new completion dates, we now consider whether the trial court erred when it granted defendants' motions for summary judgment and denied Bluewater's motion for summary judgment.

¶ 162                              A. Bluewater

¶ 163          We first consider whether Bluewater produced sufficient evidence to establish a genuine issue of material fact that it provided timely notice to the Bank under section 24 of the Act. Section 24 provides that "[s]ub-contractors *** at any time after making his or her contract with the contractor *** shall within 90 days after the completion [of work] *** cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent *** to the lending agency." 770 ILCS 60/24 (West 2008). In other words, in order to defeat summary judgment, Bluewater must have produced evidence that it completed work on the property within 90 days of serving the Bank with notice of its lien claim. See 735 ILCS 5/2-1005(c) (West 2008).

¶ 164          As previously noted, Bluewater served the Bank with notice of its lien on the property when Bluewater recorded its lien claim on April 3, 2009, stating that they completed their work on January 4, 2009. Bluewater was not able to produce evidence that work occurred on

that date and now claims that that date was mistaken and that work was completed on January 5, 2009.

¶ 165    To establish that work occurred on January 5, 2009, Bluewater primarily relies on the sworn verified affidavit of Keith Thomas, senior project manager for SMH. Thomas avers that on Monday, December 29, 2008, he approved Bluewater to perform $4,600 of cement work on the property on Monday, January 5, 2009.[6] Thomas also avers that the cement work was completed, but does not specifically claim that it was in fact completed on January 5 or on any other date.

¶ 166    In his discovery deposition, Kiferbaum was questioned about the cement work. He testified that his father, Hanan Kiferbaum, paid for the concrete work and that "the idea was that Bluewater was going to reimburse him on that particular item." However, Hanan was "reimbursed for that" and Kiferbaum could not recall which date his father performed the concrete work. When Kiferbaum was asked whether Bluewater had ever employed anyone other than himself, Kiferbaum responded, "At one point, and I don't know if it's considered to be as an employee or subcontractor, my father, Hanan Kiferbaum, had worked on projects with me."

¶ 167    Bluewater produced sufficient evidence to establish a genuine issue of material fact as to whether it completed work within 90 days of notifying the Bank of its lien claim. Bluewater produced an email evidencing an agreement to complete cement work within the 90-day period. This agreement took place just three days before the 90-day period began. Moreover, Thomas, who is not affiliated with Bluewater, corroborated in his sworn affidavit that the agreement to do the cement work did occur on December 29, 2008, and that the work subject

---

[6] In its original document production, Bluewater produced the email in which Thomas approved the January 5, 2009, cement work.

to this agreement was ultimately completed. In addition, Kiferbaum testified that his father completed the cement work. While Kiferbaum was unsure whether to call his father an employee of Bluewater and unsure about the exact date his father performed the cement work, Kiferbaum testified that the plan was for Bluewater to reimburse his father for the work.

¶ 168    In light of the foregoing evidence, the trial court erred when it granted defendants' motion for summary judgment against Bluewater because the evidence establishes a genuine issue of material fact as to whether Bluewater notified the Bank within 90 days of work completion. For the same reason, the trial court properly denied Bluewater's motion for summary judgment against defendants.

¶ 169                                    B. Premier

¶ 170    Finally, we consider whether Premier produced sufficient evidence to create a genuine issue of material fact as to whether Premier timely recorded its lien claim under section 7 of the Act. Section 7 provides that, in order to be enforceable against third parties, a lien claimant must file or record a lien claim "within 4 months after completion." 770 ILCS 60/7 (West 2008).

¶ 171    As noted, Premier recorded its lien claim on June 26, 2009. Subtracting four months from this date, February 26, 2009, is the earliest date that Premier could have completed work on the property to comply with section 7. Thus, Premier must produce evidence that it completed work on the property on or after February 26, 2009. On its lien claim, Premier originally stated that February 27, 2009, was its date of completion. However, Premier was not able to produce evidence that work occurred on that date. Nevertheless, Premier now claims that the date was mistaken and that work was actually completed on March 4, 2009.

¶ 172      To establish that work occurred on March 4, 2009, Premier submitted a timesheet reflecting that date as well as the sworn verified affidavits of Ann Birt, Jack Hartnett, a foreman for Premier on the property, and Christopher Birt, Joseph's brother and an employee of Premier.

¶ 173      Ann's affidavit stated that she "manually searched for time records *** as part of the original document production" and found timesheets from "November 14, 2008 through December 29, 2008." Ann also stated that after the original document production, Joseph "informed her that he believed that December 29, 2008, was not the last of work on [the] project because the work was not finished when he received" the check from Harris on February 27, 2009. She stated: "At [Joseph's] request I re-examined our time record books including the records for 2009 and noted that I overlooked a time sheet for March 4, 2009, a true and accurate copy of which is attached to this affidavit."

¶ 174      Hartnett's affidavit stated that, as a foreman on the project, "the last day [he] recall[ed] working on the project was on March 4, 2009." He stated that he completed the time record that Ann stated she initially overlooked. Moreover, Hartnett stated that on December 29, 2008, "snow and ice prevented installing permanent flashing around the skylight curbs that had been cut into the roof but [he] recall[ed was] not finished." He stated that temporary flashings were installed until Premier could install ones that were permanent. Hartnett stated that the reason why the work was not completed until March 4, 2009, was because "there was adverse weather (snow, ice and cold) which prevented the brick masons from repairing work" and because the "mortar joints were deteriorated so that [Premier] could not attach the termination bar and counter-flashing without brick masons first repairing that part of the wall."

¶ 175     Christopher Birt's affidavit stated he recalled "after December 29, 2008, work was suspended due to weather [conditions] and due to the fact that other trades did not complete installing the HVAC units on the roof until February 2, 2009." Christopher stated that "[o]ften work is interrupted due to adverse weather conditions such as freezing temperatures which may cause the Johns Mansville roofing material [Premier] used on the roof to crack and/or not adhere properly to the underlayment" and that "work is often delayed until other trade complete their involving roof penetrations[,] such as piping, mechanical units, skylights curbs, and other such items." Finally, he stated that he completed the project on March 4, 2009, "including the flashing and priming [of the roof]."

¶ 176     Premier produced sufficient evidence to establish a genuine issue of material fact as to whether it completed work within four months of filing its lien claim. Premier produced not one, but three affidavits stating in detail the reasons for the original incorrect completion date and the reason work was not completed until March 4, 2009. Given the foregoing evidence, the trial court erred when it granted defendants' motion for summary judgment against Premier.

¶ 177                                    CONCLUSION

¶ 178     In conclusion, (1) the Bank has not yet released its mortgage and has standing in this action; (2) plaintiffs' statements of incorrect completion dates do not constitute binding judicial admissions and do not bar plaintiffs from presenting evidence of a later completion date within the statutory period; (3) plaintiffs' mechanics liens are facially enforceable as a matter of law; (4) the trial court erred when it denied plaintiffs' motions for leave to amend their counterclaims with new completion dates; and (5) there are genuine issues of material fact concerning whether plaintiffs complied with the requirements of the Mechanics Lien

Act. As a result, the trial court erred when it granted defendants' motions for summary judgment against plaintiffs. However, we affirm the trial court's denial of Bluewater's motion for summary judgment for the same reasons.

¶ 179   Affirmed and reversed in part; cause remanded with instructions.